385 A.2d 365

**COMMONWEALTH of Pennsylvania**

v.

**Anna Mae ANDERSON, Appellant.**

Superior Court of Pennsylvania.

Submitted April 17, 1975.

Decided April 13, 1978.

John P. Liekar, Public Defender, Canonsburg, for appellant.

Jack H. France, Assistant District Attorney, Charleroi, and Jess D. Costa, District Attorney, Bentleyville, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

HOFFMAN, Judge:

This case presents an issue of first impression in Pennsylvania: must a coroner advise a parent whom he suspects of causing her child's death by abuse, of her *Miranda*[1] rights. We conclude that the federal constitution did not obligate the coroner in the instant case to apprise appellant of her *Miranda* rights. Accordingly, we affirm the judgment of sentence.[2]

On January 11, 1972, Washington County police officials arrested appellant and filed a criminal complaint which charged her with the involuntary manslaughter[3] of her four year old son. On January 21, 1972, appellant's attorney filed an application to suppress oral and written statements

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See* discussion, infra.

2. Appellant made two inculpatory statements: one to the coroner on the morning of January 5, 1972, and one to the coroner, a police sergeant, and a county detective on the afternoon of January 5, 1972. Appellant challenges the admissibility of the first statement because the coroner failed to give *Miranda* warnings at the morning interview. We reject this claim. Appellant also contends that the afternoon statement, given after the coroner advised appellant of her *Miranda* rights, should have been suppressed because it was a fruit of the poisonous first admission. Because we have determined that the first admission was not obtained in violation of the federal constitution, the essential predicate, a poisonous tree, for appellant's second contention is missing. Accordingly, we reject appellant's second contention as well.

3. The Crimes Code, Act of Dec. 6, 1972, P.L. 1482, No. 334, § 1; 18 Pa.C.S. § 2504.

obtained in violation of appellant's rights under the Fifth Amendment to the United States Constitution.[4] The Commonwealth filed an answer denying appellant's assertion. On March 20, 1972, the lower court conducted a suppression hearing. At this hearing, Mr. Farrell Jackson, Coroner of Washington County, testified that on Friday, December 31, 1971, an employee of a local hospital informed him that a child named Richard Anderson had died earlier that day, possibly as a result of child abuse. The coroner immediately ordered the removal of the child's body to another hospital so that a pathologist could perform a post-mortem examination to determine the cause of death. The coroner also learned that appellant was the child's mother.

On January 3, 1972, the coroner telephoned appellant and asked her to come to his office at 10:00 a. m. that day; appellant acceded to this request. When she arrived, Coroner Jackson stated that he asked her to come to his office because the hospital had reported a suspicion that child abuse had caused the child's death. He also disclosed that he had ordered a pathologist's report which would be completed in a day or two. The subsequent conversation lasted 45 minutes. The coroner's secretary transcribed the interchange. The discussion concerned the nature of the coroner's duties and general details of how the death occurred. In sum, it was exploratory rather than accusatory. Appellant attributed her child's demise to a fall; she made no self-incriminating statements. At the close of the conversation, the coroner asked appellant to return to his office at 10:30 a. m. on January 5, 1972, in order to discuss the findings contained in the expected pathologist's report. The coroner suggested that appellant bring an attorney.

At 10:30 a. m. on January 5, 1972, appellant again appeared at the coroner's office; she had not retained an attorney. Coroner Jackson informed appellant of the pathologist's report which indicated possible child abuse and

4. U.S.Const. Amend. V provides, in pertinent part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . .."

that the injury which resulted in death could not have been caused by a fall. Further, the coroner testified: "Well, I discussed the nature of the death, the cause of the death, and informed her that the doctors who were involved are compelled by law to report these, and as a coroner's office it is our duty to see to it that those who do such things are prosecuted or recommended for prosecution and this is my intent, and I felt from what I had learned that she was involved, and this is what this office intended to do." (Notes of Suppression Hearing, p. 7) Appellant then expressed a willingness to tell the coroner what happened. Before further questioning, the coroner reminded appellant that he had advised her on January 3, 1972, to consult with an attorney; appellant responded that she did not know if he had given such advice. Appellant also stated that she had wanted to consult with an attorney. The coroner then asked the following question: "Now, you appeared here this morning without an attorney and what you are about to say now, is voluntary on your part?" (N.S.H. 9) Appellant responded affirmatively and then implicated herself by stating that she struck her child with her hand. The trier of fact found that this blow caused his death.

After appellant made her statement, the interview ended. Appellant returned home. Coroner Jackson proceeded to the District Attorney's office to ascertain what he should do next. On cross-examination, the coroner asserted that even in the absence of appellant's admission, he would have recommended further investigation to the District Attorney because, based upon the pathologist's report, he believed that appellant had abused her son and caused his death. The District Attorney advised him that he had not fully informed appellant of her *Miranda* warnings and that he should call her back. The coroner then notified appellant to return to his office at 2:00 p. m. that afternoon. A police sergeant, a county detective, the coroner, and his secretary awaited; appellant returned alone. The coroner informed appellant that he had failed to instruct her properly about her rights against self-incrimination before the second inter-

view. A police sergeant then informed her of the full *Miranda* rights, and appellant signed a written form which waived these rights. Subsequently, she verified the statement which she had given that morning as true and correct.

On March 21, 1972, the lower court denied appellant's motion to suppress the statements she made on the morning and afternoon of January 5, 1972. On March 27, 1973, the lower court, sitting without a jury, found appellant guilty of the crime charged. Appellant filed written post-verdict motions which specifically raised the contention that the lower court should have suppressed all her statements to the coroner and police. On April 26, 1974, the lower court sentenced appellant to a maximum two year term of imprisonment in a state institutional home and to pay the costs of prosecution. The lower court also granted a supersedeas on the sentence. This appeal followed.

Appellant contends that the lower court should have suppressed the statement made on the morning of January 5, 1972, because the coroner failed to inform her fully of her rights against self-incrimination as required by *Miranda v. Arizona,* supra, and the Fifth Amendment to the United States Constitution. In *Miranda,* the United States Supreme Court promulgated the following rules pertaining to police interrogation of a suspect:

" . . . The prosecution may not use statements, whether exculpatory or inculpatory, *stemming from custodial interrogation of the defendant* unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.* . . . As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any

statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any state of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." Supra at 444, 86 S.Ct. at 1612. (Emphasis supplied) (Footnote omitted). In the instant case, appellant did not receive any *Miranda* warnings prior to the questioning on the morning of January 5, 1972. Consequently, the crux of this case turns on whether appellant's statement that morning stemmed from custodial interrogation.

To determine the parameters of the "custodial interrogation" which necessitates the procedural safeguards of *Miranda,* we must closely examine recent United States and Pennsylvania Supreme Court precedents. In *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), two special agents of the Internal Revenue Service, investigating possible criminal tax fraud, questioned Beckwith at his home for three hours. The agents did not inform Beckwith of the rights specified in *Miranda* and the suspect made compromising statements which the trial court refused to suppress. On appeal, the United States Supreme Court stated that "[a]lthough the 'focus' of an investigation may indeed have been on Beckwith at the time of the interview in the sense that it was his tax liability which was under scrutiny, he hardly found himself in the custodial situation described by the *Miranda* court as the basis for its holding." 425 U.S. at 347, 96 S.Ct. at 1616. In short, *Beckwith* holds

that a primary suspect is not entitled to *Miranda* warnings unless some indicia of custody accompany the interrogation. Moreover, the Court rejected the petitioner's contention that the tax agents' request for an interview placed him in "psychological" and "functional" custody. Instead, the *Beckwith* court concentrated on the compulsion which inheres in incommunicado interrogation in a police-dominated atmosphere. For purposes of determining when the *Miranda* warnings must be given, the relevant compulsion stems not from the suspect's perceived need to attend a police-suggested interview, but from indicia of custody which lead a suspect to believe that the police will not release the interviewee until they have elicited a confession.

The United States Supreme Court most recently considered the scope of "custodial interrogation" in *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). There, the owner of a burglarized house told a police officer that she suspected Mathiason. Mathiason was a parolee. The police officer went to the suspect's apartment and left a note which asked the suspect to call. When Mathiason contacted the officer, they arranged to meet at a state police office about two blocks from defendant's apartment. Upon Mathiason's arrival, the police officer took him to an office, closed the door, and told him that he was not under arrest. The officer then stated that the police believed Mathiason had committed the burglary because his fingerprints had been found at the scene of the crime. In fact, the officer lied; the police had not found Mathiason's fingerprints. After the officer advised the suspect that a district attorney or judge might favorably consider truthfulness, Mathiason confessed. The interview then terminated. However, instead of arresting Mathiason at that moment, the officer told Mathiason that he would refer the case to the District Attorney for a determination of whether to prosecute.

The Supreme Court of Oregon concluded that *Miranda* warnings had been required because the questioning took place in a coercive environment. In a per curiam opinion, the United States Supreme Court disagreed and reversed.

The Court recognized that any interview between a suspect and a police officer carries coercive aspects. Nevertheless, the Court refused to require *Miranda* warnings "simply because the questioning takes place in the station house or because the questioned person is one whom the police suspect." 429 U.S. at 495, 97 S.Ct. at 714. In particular, the Court emphasized the following facts and conclusions:

"In the present case, however, there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a one half-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.'" Id. *Oregon v. Mathiason* reinforces the central message of *Beckwith v. United States:* a court must objectively focus on the compulsion which emanates from a restriction on the suspect's freedom to leave an interview, not on the psychological compulsion which leads a suspect to participate in such an interview.

The Pennsylvania Supreme Court has also attempted to define "custodial interrogation" in two recent cases. In *Commonwealth v. Brown*, 473 Pa. 562, 375 A.2d 1260 (1977), the Supreme Court reversed a homicide conviction because the police conducted custodial interrogation without warning Brown of his constitutional rights. The Court observed that ". . . custodial interrogation does not require that the police make a formal arrest, nor that the police intend to make an arrest. [*Commonwealth v. Fisher*, 466 Pa. 216, 352 A.2d 26 (1976)]; *Commonwealth v. O'Shea*, [456 Pa. 288, 318 A.2d 713 (1974), cert. denied, 419 U.S. 1092, 96 S.Ct. 686, 42 L.Ed.2d 685]; *Commonwealth v. Bordner*, 432 Pa. 405, 247 A.2d 612 (1968). Rather, the test of custodial interrogation is whether the individual being interrogated reasonably believes his freedom of action is being restricted." 473 Pa. at 570, 375 A.2d at 1264. *See also Commonwealth v. Peters,*

473 Pa. 72, 373 A.2d 1055 (1977) (plurality opinion). Applying this standard, the Court concluded that Brown had a reasonable belief that his freedom of action had been restricted when the police interrogated him on October 15, 1973. On the day before the October 15 interview, the police had questioned the suspect intermittently over a ten hour period in the police station. While the police told Brown at the outset of the first session that he was not under arrest, the police did not repeat this information the next day. Furthermore, on October 15, the questioning commenced at the suspect's place of employment, but subsequently shifted, at the demand of the police, to the station house so that Brown could "iron out discrepancies" between his account and statements given by another interviewee. Thus, the Court reasoned that under all the circumstances, the defendant could not have reasonably believed that his freedom remained unfettered when the police returned him to the police station on October 15.[5] *See also Commonwealth v. Banks*, 429 Pa. 53, 239 A.2d 416 (1968).

*Commonwealth v. McLaughlin*, 475 Pa. 97, 379 A.2d 1056 (1977) represents the Supreme Court's most recent pronouncement on the scope of "custodial interrogation." In *McLaughlin* defendant, a federal program co-ordinator, received an administrative subpoena from the Office of the Philadelphia Comptroller requesting that he explain certain allegedly falsified expense vouchers. McLaughlin appeared at the comptroller's office where the First Deputy Comptroller questioned him under oath and without prior *Miranda* warnings. A stenographer recorded the interrogation. At the end of the session, McLaughlin left and the comptroller subsequently sent a report of the investigation to the Philadelphia District Attorney. A prosecution ensued.

---

**5.** The Court distinguished *Oregon v. Mathiason.* In that case, the defendant voluntarily went to the police station by himself to participate in an interview the time and place of which he had helped to arrange. Moreover, the defendant implicated himself within five minutes of his arrival. In *Brown*, however, appellant was not given any option as to the time and place of questioning and police officers accompanied him to the station house. Furthermore, interrogation dragged on over a two day period. The Court did not discuss the application of *Beckwith v. United States* to Brown's situation.

The Supreme Court reversed the lower court's suppression order, which our Court had affirmed, 231 Pa.Super. 129, 332 A.2d 812 (1974), because it believed that the Deputy City Comptroller had no obligation to warn the defendant of his *Miranda* rights before the questioning started. First, the Court held that the questioning did not constitute "custodial interrogation" within the meaning contemplated by the *Miranda* court. The Court stated that "[i]n Pennsylvania, 'custodial interrogation' has been interpreted to mean either questioning . . . 'while in custody *or while the object of an investigation of which he is the focus,* . . .' *Commonwealth v. Feldman*, 432 Pa. 428, 432–33, 248 A.2d 1, 3 (1968). *Commonwealth v. D'Nicuola*, 448 Pa. 54, 57, 292 A.2d 333, 335 (1972)." 475 Pa. at 101, 379 A.2d at 1057 (Emphasis in original). However, the Court recognized that *Beckwith v. United States*, supra, eliminated any definition of "custodial interrogation" based solely on a defendant's status as primary suspect at the time of interrogation. In light of *Beckwith*, the Court re-examined prior Pennsylvania case law and concluded that "[i]n each case recognizing the defendant as the focus of an investigation, there was also present a degree of 'deprivation of liberty' which the *Beckwith* Court found *Miranda* to require. *Commonwealth v. D'Nicuola*, supra; *Commonwealth v. Simala*, 434 Pa. 219, 252 A.2d 575 (1969); *Commonwealth v. Jefferson*, 432 Pa. 541, 226 A.2d 765 (1967)." 475 Pa. at 102, 379 A.2d at 1058. The Court did not mention the long line of cases, culminating in *Commonwealth v. Brown*, which had endorsed a definition of "custodial interrogation" based on a suspect's reasonable perception that his freedom of action has been restricted.[6] In conclusion, the Court held that under the *Beckwith* interpretation of *Miranda*, McLaughlin clearly was not "in custody" during this interrogation.[7]

**6.** We also note that the *McLaughlin* Court did not discuss the impact of *Oregon v. Mathiason*, on the meaning of "custodial interrogation."

**7.** The Court next discussed whether Article I, Section 9 of the Pennsylvania Constitution afforded broader protection for McLaughlin than that provided by *Miranda* and the United States Constitution. The Court ruled that the Pennsylvania Constitution did not

 By distilling the essence of these United States and Pennsylvania Supreme Court precedents, we conclude that the following guidelines govern the determination of when a "custodial interrogation" which triggers the need for *Miranda* warnings occurs. First, the mere fact that the police investigation has focused on a particular person will not require *Miranda* warnings before police interviews with that person. *See Beckwith v. United States*, supra; *Commonwealth v. McLaughlin*, supra. Second, if the police in fact place a person in custody or restrict his freedom in any significant way prior to, or during, the interview, then the interrogators must advise that person of his *Miranda* rights. *Miranda v. Arizona*, supra; *Commonwealth v. Leaming*, 432 Pa. 326, 247 A.2d 590 (1968); *Commonwealth v. Moody*, 429 Pa. 39, 239 A.2d 409 (1968), cert. denied, 393 U.S. 882, 89 S.Ct. 189, 21 L.Ed.2d 157. Third, a suspect actually may be in custody even if the police have not taken him to a police station or formally arrested him.[8] Fourth, and this proposition is not without some doubt, "custodial interrogation" occurs when a suspect ". . . is placed in a situation in which he reasonably believes that his freedom of action of movement is restricted by such interrogation." *Commonwealth v. Brown*, supra, 473 Pa. at 570, 375 A.2d at 1264; *Commonwealth v. Fisher*, supra; *Commonwealth v. O'Shea*, supra; *Commonwealth v. Romberger*, 454 Pa. 279, 312 A.2d 353 (1973); *Commonwealth v. Marabel*, 445 Pa. 435, 283 A.2d 285 (1971). While the Pennsylvania Supreme Court in *McLaughlin*, supra, did not advert to this reasonable belief

mandate *Miranda* warnings in non-criminal, administrative investigations.

8. *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (*Miranda* warnings required when four police officers arrested petitioner in his bed at 4:00 a. m.); *Commonwealth v. Fisher*, 466 Pa. 216, 352 A.2d 26 (1976) (*Miranda* warnings required when suspect interrogated in hospital room under police guard); *Commonwealth v. Bordner*, 432 Pa. 405, 247 A.2d 612 (1968) (facts similar to those in *Commonwealth v. Fisher*); cf. *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963) (An arrest may be accomplished by any action that indicates an intention to take a person into custody and to subject him to the actual control and will of the person making the arrest).

test, we refuse to believe that the Supreme Court meant to overrule, *sub silentio*, a long line of Pennsylvania cases approving this test. In *McLaughlin*, the Supreme Court merely decided that the status of primary focus of an investigation alone did not require the administration of *Miranda* warnings; the Court did not discuss exactly what extra elements were necessary before it would find "custodial interrogation." Indeed, it is clear that McLaughlin could not have had a reasonable belief that he was "in custody" and would not be released after the questioning. Also, the United States Supreme Court has not explicitly rejected a test predicated on a suspect's reasonable perception that his freedom has been restricted. The facts of *Beckwith v. United States*, supra, and *Oregon v. Mathiason*, supra, both reveal situations in which the interviewees could not have reasonably believed that the police had restricted their freedom of action. In *Beckwith*, the tax agents interviewed the suspect in the privacy of his home, they had not formally arrested the suspect, and they gave him no reason to suspect that he was not free to leave or terminate the interview. In *Oregon v. Mathiason*, supra, Mathiason helped to arrange the interview, the police officer expressly advised Mathiason that he was not under arrest, and Mathiason in fact left freely at the end of the interview. Accordingly, we conclude that neither the United States Supreme Court nor the Pennsylvania Supreme Court has foreclosed an objective reasonable belief test. We believe this test retains its validity. *Commonwealth v. Brown*, supra. When the police create a situation in which a person has a reasonable belief that he will be held incommunicado during and after the interview, then *Miranda* warnings are necessary to dispel the compulsion which inheres in this perceived involuntary and unlimited detention. *Commonwealth v. Sites*, 427 Pa. 486, 235 A.2d 387 (1967).

■ We must now apply these four guidelines to the instant case. Initially, we note that a coroner in Pennsylvania has powers which in fact make him part of the Common-

wealth's criminal investigation team. 16 P.S. § 1237 [9] autho-rizes a coroner to investigate suspicious deaths in order to determine whether there is sufficient evidence of criminal acts to justify the holding of an inquest. If the coroner conducts an inquest, 16 P.S. § 1245 [10] confers power upon the coroner to issue subpoenas and attachments to obtain the attendance of witnesses and the production of documents. If the coroner concludes after an inquest that the death resulted from criminal conduct, he may act as a committing magistrate. See *Commonwealth v. Sullivan*, 446 Pa. 419, 286 A.2d 898 (1971); *Commonwealth v. Lopinson*, 427 Pa. 284, 234 A.2d 552 (1967). Finally, 16 P.S. § 1242 [11] directs the coroner, during the course of his investigation, to consult with the District Attorney. Given these statutory and com-mon law powers, we will assume that a coroner investigat-ing a suspicious death has the same status as a police officer investigating any suspected crime.

In the case at bar, appellant was already the focus of the coroner's investigation; indeed, she was the only suspect. However, without some further indicia of an actual or a reasonably perceived restraint on appellant's freedom of action, *Miranda* warnings would not have been required. *Beckwith v. United States*, supra; *Commonwealth v. McLaughlin*, supra. Appellant concedes, as she must, that Coroner Jackson had not in fact restrained her freedom of action in any way; he did not place her under arrest or expressly indicate that she would be detained until she fully cooperated with his investigation.[12] Thus, we must deter-mine whether appellant had a reasonable, even though erro-neous belief that the coroner had restrained her freedom of

**9.** The Act of August 9, 1955, P.L. 323, § 1237.

**10.** The Act of August 9, 1955, supra.

**11.** ·The Act of August 9, 1955, supra.

**12.** Coroner Jackson did not have *power* to arrest appellant at this stage in the investigation. *Commonwealth v. Sullivan* and *Common-wealth v. Lopinson*, supra, require the initiation of a formal inquest proceeding before a coroner may exercise the power of arrest. An inquest proceeding had not been launched in the instant case.

action. We conclude that appellant could not have had a reasonable belief that she had been detained by the coroner on the morning of January 5, 1972. First, appellant's prior contact with the coroner on January 3, had been brief, courteous, and exploratory in nature. At the end of this interview, appellant was free to go. Appellant voluntarily attended the second interview on the morning of January 5. Like the first session, this meeting was not protracted and appellant was in fact free to leave at the end. *Commonwealth v. Brown*, supra, stands in marked contrast: In *Brown*, the police had detained the suspect twice for prolonged periods of time; the police controlled the location and duration of the interview without any assent by the suspect. Therefore, Brown had a reasonable belief that the police continue to hold him incommunicado unless and until he co-operated with the questioning. (*Contrast also Commonwealth v. Romberger*, supra, and *Commonwealth v. Marabel*, supra, both cases in which the police detained suspects for questioning over prolonged periods of time.) In the instant case, the coroner informed appellant that he intended to recommend or initiate prosecution. At most, this representation allowed appellant to infer reasonably that further investigation and proceedings would follow. It cannot reasonably be construed as notification that the coroner had decided to arrest appellant at that very moment. In short, the coroner's conduct gave appellant no more reason to surmise that she had been placed in custody than the reason any other suspect has when being questioned during the course of a police investigation. *Compare Commonwealth v. McLaughlin*, supra, in which the Supreme Court held that a city comptroller's interview with a suspect, under the compulsion of a subpoena, did not constitute "custodial interrogation." *See also Commonwealth v. Columbia Investors Corp.*, 457 Pa. 353, 325 A.2d 289 (1974). Any compulsion inherent in the coroner's questioning stemmed from appellant's perception that non-co-operation might not be viewed favorable rather than from a reasonable perception that appellant's liberty had in fact been restricted. Accordingly, we hold that the coroner's interview on the morning of

January 5, 1972, did not constitute "custodial interrogation" and, consequently, that Coroner Jackson was not required to give appellant *Miranda* warnings before questioning. The lower court properly admitted appellant's statements implicating her in the abuse and death of her child.[13] Therefore, we affirm the judgment of sentence.

Judgment of sentence affirmed.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

PRICE, J., concurs in the result.

**13.** Appellant has not contended that, considering all the circumstances, her statements to the coroner were elicited involuntarily in violation of federal and state due process guarantees. Because appellant did not specifically raise this issue in her application to suppress evidence, we are precluded from reaching it. *See* Pa.R.Crim.P. 323(d); 19 P.S.Appendix; *Commonwealth v. McLaughlin,* supra. We also note that appellant has not relied at any point on the protection of Article I, Section 9 of the Pennsylvania Constitution. In *McLaughlin,* our Supreme Court intimated that this state constitutional provision may encompass a higher standard of protection than the minimum standards of the federal constitution delineated in *Beckwith v. United States* and *Oregon v. Mathiason. See, generally,* Brennan, *State Constitutions and The Protection of Individual Rights,* 90 Harv.L.Rev. 489 (1977). We intimate no opinion as to the applicability of Article I, Section 9 of the Pennsylvania Constitution to the facts of the case at bar.