467 A.2d 336

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Cecelia MARKMAN.**

Superior Court of Pennsylvania.

Argued March 3, 1983.

Filed Sept. 16, 1983.

Reargument Denied Nov. 18, 1983.

Petition for Allowance of Appeal Denied Mar. 5, 1984.

Franklin L. Noel, Assistant District Attorney, Philadelphia, for Commonwealth, appellant.

Jeffrey M. Miller, Philadelphia, for appellee.

Before CAVANAUGH, WIEAND and HOFFMAN, JJ.

CAVANAUGH, Judge:

■ This case involves an appeal from an order of the court below suppressing all evidence obtained as a result of a search on March 6, 1981, of a premises damaged by fire, and searches subsequent thereto, and suppressing statements made by the appellee, Cecelia Markman, on the date of the fire and on subsequent dates prior to her arrest. Appellee was charged with risking a catastrophe and arson. The Commonwealth has appealed from the suppression order by the hearing judge.[1]

■ When we review an order suppressing evidence we are not bound by the lower court's conclusions of law. "We are bound, however, by the court's findings of fact, if the

---

1. The Commonwealth's appeal is properly before this Court. In *Commonwealth v. Lapia*, 311 Pa.Super. 264, 277, 457 A.2d 877, 884 (1983), we held that "[w]hen confronted with a Commonwealth appeal from an order suppressing evidence, we must first determine for ourselves whether the order is appealable—whether it terminates or substantially handicaps the prosecution; and we must make that determination on the basis of the record, and on that basis alone." *See* also *Commonwealth v. Johnson*, 315 Pa.Super. 579, 462 A.2d 743 (1983). Applying the above test to our case, we conclude that the suppression order is appealable. In the instant case the appellee was charged with risking catastrophe and arson. Suppression of the various statements by appellee which placed her at the scene of the fire shortly before its occurrence, and her description of where various items were located in the building before the fire, would clearly hamper the prosecution. Arson is frequently proven only by circumstantial evidence and appellant's statements are most important in this regard.

findings are supported by the evidence." *Commonwealth v. Chandler,* 312 Pa.Super. 1, 3, 458 A.2d 204, 205 (1983). The court below made findings of fact which fall into two main categories, those dealing with the search of the premises at 1408 Snyder Avenue, Philadelphia, Pennsylvania, where the fire occurred on the early morning of March 6, 1981 and those dealing with statements by Ms. Markman, who operated C. Markman's Jewelers, a small jewelry shop at that location. At about 12:10 a.m. on March 6, 1981, a fire was reported at 1408 Snyder Avenue. This was a one alarm fire which was extinguished at about 1:00 o'clock. Ms. Markman who rented the store had left the premises a short time before the fire. The owner of the property, Mr. Rothschild, arrived at the scene at about 2:00 a.m. and inspected the premises. Ms. Markman also arrived at the scene of the fire shortly after it was extinguished and she called Russell Glass Company to have the doors and windows boarded up where they were broken. The building was secured by 3:30 a.m.

At about 8:00 a.m. on March 6, 1981, Lt. Caldwell of the Philadelphia Fire Department and Lt. Baxter, who was a trainee in fire investigation, went to the scene of the fire to investigate and found the building completely boarded up and secured. They inquired at a nearby drugstore where the proprietor stated that he knew the tenant and indicated that she would be back at about noon. The fire officials returned to their office and at about 9:30 a.m. Lt. Caldwell received a call from Mr. Rothschild concerning the fire.[2]

---

**2.** Mr. Rothschild testified concerning the telephone call as follows:

Q. For what purpose did you call the Fire Marshall's Office on March 6th?

A. On the advice of my attorney I called the fire marshall; asked the Fire Marshall's Department to perform an investigation of the fire at 14—I think that is 1401 Snyder Avenue, Markman's Jewelry store.

. . . . .

Q. So you believed that arson had been responsible for the fire?

A. At that time I didn't know. I don't claim to be an arson investigator, but I could see that the fire was not electrical, and I—as I said, I wanted a proper investigation to be performed.

Lt. Caldwell testified concerning the telephone with Mr. Rothschild:

He requested that the fire be investigated and indicated that Ms. Markman may have been involved with the fire. Lt. Caldwell and Lt. Baxter returned to the drugstore at about 12:30 p.m. where they located the appellee and proceeded to the fire scene to commence the investigation. Ms. Markman testified that since the premises were boarded up she went around the corner to obtain a hammer to remove some·nails and that the nails were removed by Lt. Caldwell as she "couldn't reach". Once inside the building Ms. Markman answered questions concerning the placement of certain items in the building the night before. Lt. Caldwell took several photographs of the fire scene and also removed samples of carpet, a laminated desk top and some liquid. The purpose of the inspection was to determine the cause and the origin of the fire. In order to visualize the premises before the fire Lt. Caldwell asked Ms. Markman various questions and ·she "responded freely". Ms. Markman's conversations with Lt. Caldwell took place in the premises where the fire occurred, at the nearby drugstore, and at Ms. Markman's property at 2124 South Broad Street.

The first issue is whether there was a proper entry into the premises on March 6th in the absence of a search warrant. The court below concluded that the appellee did not voluntarily consent to the entry as her consent was

Q. Mr. Rothschild told you, did he not, that he believed the fire had been set by Ms. Markman?
A. He did not say he believed the fire had been set. He believed she was responsible.
Q. He believed she was responsible for the fire?
A. Yes.

Q. At the very least, then, upon receipt of that information you then had some suspicion that the fire might have been of some unnatural origin; is that correct?
A. I had no idea at all.
Q. You didn't even have a suspicion that there might have been a setting of a fire as a result of information obtained from Mr. Rothschild?
A. I cannot suspect anything until I look at it and see it for myself.

Q. You are telling me, sir, that the receipt of the phone call from Mr. Rothschild has no bearing whatsoever on your investigation?
A. That's correct.

obtained by trickery and deceit. The court stated in its discussion: "Therefore, the withholding by Caldwell of his affiliation with the arson strike force, his belief that arson occurred, his belief that the defendant perpetrated the arson and his failure to advise the defendant of her right to deny him entry absent a search warrant, renders the consent defective for fraud and deceit." We note that there was no evidence at all that Lt. Caldwell believed that arson had occurred or that the appellee had perpetrated the arson. In fact, the only evidence concerning Lt. Caldwell's belief prior to entry into the building was that he had no idea at all whether the fire was the result of arson or that appellee was involved until he had an opportunity to inspect the burned premises. There is no evidence that the appellee gave her consent to enter the building as a result of trickery and deceit. Appellee was aware that the two officers of the fire department were present to investigate the fire. She testified that she wanted to cooperate in finding the cause of the fire. The court below vitiated the consent to enter the premises because Lt. Caldwell stated to her, according to Ms. Markman, that "he had to get in and that he was doing a routine fire inspection." [3] The fact is

3. With respect to this Ms. Markman testified:
   Q. What if anything did Lieutenant Caldwell say when you had your first communications with him?
   A. Lieutenant Caldwell said he was from the fire department, and he was there to investigate the fire. He said, "And I have to get in to see the premises."

       .      .      .      .      .

   Q. Why did you allow him entry?
   A. Because he said he had to get in and that he was doing a routine fire investigation.
   Lt. Caldwell testified with respect to his conversation with Ms. Markman concerning entry into the building which had been secured as follows:
   Q. After identifying yourself to the defendant, what if anything did you say to her?
   A. I introduced myself and Lieutenant Baxter as men from the Philadelphia Fire Marshall's Office and we were there to look at the fire at 1408 West Snyder.

       .      .      .      .      .

   Q. Did you ask her if you could get into the building 1408 West Snyder?

that Lt. Caldwell did have to make an inspection of the building and if Ms. Markman had refused entry he would have followed the procedure necessary to obtain a search warrant.[4] Lt. Caldwell knew that there were administrative procedures to be followed to obtain a search warrant although he had never been refused entry to conduct a fire investigation.

■ The court below relied on *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) and stated that "the [United States Supreme] Court held that every entry into a fire scene to investigate its cause after the scene had been secured is unconstitutional unless preceded by a search warrant." In *Michigan v. Tyler, supra,* the search was made on several occasions after the fire and at no time was consent obtained from the owner or the tenant of the building. We agree in the matter before us that if the appellee had not consented to the search that the entry by the fire officials into the building would have been improper. However, Ms. Markman did agree to the entry and procured a hammer so that the boards which had been nailed up on the morning of March 6th could be removed. The evidence does not support the conclusion of the court below that Ms. Markman's consent was defective since it was based on "fraud and deceit." The fire marshall's office had the obligation to investigate the fire which had occurred

A. Yes, I did.
Q. What was her response?
A. "Sure."

4. Lt. Caldwell testified that it "is our responsibility to investigate every fire within the City of Philadelphia." The statement is in accordance with the Act of June 8, 1911, P.L. 705, Section 6, 53 P.S. § 14526, which provides:

§ 14526. Investigation of cause of fires; report
The Fire Marshal of every city of the first class of this Commonwealth shall make, or cause to be made, an investigation of the cause, origin, and circumstances of every fire occurring in such city, by which property has been destroyed or damaged, and shall especially make investigation as to whether such fire was the result of carelessness or design. Such investigations shall be begun immediately after the occurrence of such fire, and the Fire Marshal shall have the right to supervise and direct such investigation whenever he deems it expedient or necessary. . . .

a short time before. The only way this could be done was to examine the premises, and appellee admittedly wanted to cooperate with the fire marshall's office. The fact that Lt. Caldwell did not state that he was a member of the arson strike force does not rise to the level of fraud and deceit.

There is no doubt that Lt. Caldwell went to investigate the cause of the fire on the morning of March 6, 1981, and he did not have a search warrant with him. However, he needed a search warrant only if he was denied access to the premises. We must look at the totality of the circumstances surrounding Ms. Markman's consent to determine if it was voluntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 36 L.Ed.2d 854, 93 S.Ct. 2041, 2047 (1973); *Commonwealth v. Woods,* 240 Pa.Super. 72, 368 A.2d 304 (1976); *Commonwealth v. Merbah,* 270 Pa.Super. 190, 411 A.2d 244 (1979). Some of the circumstances to be considered in determining voluntariness of consent are whether the accused has assisted in the search, and the education, intelligence and experience of the person giving consent. *Commonwealth v. Dressner,* 232 Pa.Super. 154, 336 A.2d 414 (1975). In addition, the Commonwealth need not establish that Ms. Markman was aware of her right to refuse consent to the search. *Commonwealth v. Woods, supra; Commonwealth v. Costigan,* 272 Pa.Super. 520, 416 A.2d 1018 (1979). Consent may be deemed voluntary even when procured by a police officer who misrepresents both his identity and purpose in making the search. *Commonwealth v. Morrison,* 275 Pa.Super. 454, 418 A.2d 1378 (1980), certiorari denied *Morrison v. Pennsylvania,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1980).

In the case before us, appellee was a business woman who was under no compulsion when she consented to the search of the premises on March 6, 1981. The fire officials were courteous and she was not coerced in any way. Her own testimony at the suppression hearing established that she wanted to cooperate and was anxious to learn the cause of the fire and wanted to help with the investigation. There was nothing to indicate that she would

have denied access to the fire officials even if she knew that she did not have to give consent. The court below erroneously concluded that in order to have a valid search of a premises shortly after a fire that the fire officials must have either a search warrant or a signed consent form.[5] Under the law, the requirement is that the consent to a search be voluntary, and there is not an additional requirement that it be manifested by a signed written consent. As pointed out in *Commonwealth v. Morrison, supra,* 275 Pa.Super. at 460, 418 A.2d at 1380: "Therefore, the voluntariness of a defendant's consent to search is determined by whether the consent was procured through force or other coercion." No one factor is determinative in concluding whether consent is voluntary. *Commonwealth v. Lowry,* 305 Pa.Super. 66, 451 A.2d 245 (1982).

Subsequent to his investigation of March 6th, Lt. Caldwell determined that the fire was caused by arson and continued with his investigation. On March 10, 1981 he met the appellee at her property on South Broad Street pursuant to an appointment that he had with her, and he was provided with more details about the fire. The two then went to the premises on Snyder Avenue where again the appellee assisted in gaining access and more pictures were taken. On March 14 or 15, 1981, the appellee admitted Lt. Bitto of the Fire Department who had gone to the scene to investigate together with Mr. Fricke, whose firm had installed a burglar alarm at the premises. Finally, on March 27, 1981, Lt. Fry of the Fire Department went to the fire scene where he was admitted by the appellee and took additional pictures. After he took the pictures he requested the appellee to sign a consent form which she did. At no time did a fire official tell the appellee that she did not have

---

**5.** In this respect the court below stated:

There were no exigencies to justify the warrantless search made more than nine hours after the building had been secured and eleven hours after the fire had been extinguished. Having failed to secure a search warrant, the next best thing he could have done was to have the defendant execute the Fire Department's consent form (allowing a search of the premises) before the inspection and investigation commenced.

to consent to admitting the officials to the premises that she rented, nor was she warned of her rights under the Fourth or Fifth Amendment of the United States Constitution. As pointed out in *Schneckloth v. Bustamonte,* 412 U.S. 218, 231–32, 93 S.Ct. 2041, 2050, 36 L.Ed.2d 854, 865 (1976):

> For it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning. Consent searches are part of the standard investigatory techniques of law enforcement agencies. They normally occur on the highway, or in a person's home or office, and under informal and unstructured conditions.

■ We find that in the circumstances of this case the appellee's consent to the searches was voluntarily given notwithstanding that she was not told that she did not have to consent.

■ The second issue was whether the statements given by the appellee to Lt. Caldwell and other fire officials and police officials were properly suppressed. We agree with the court below that the appellee was at no time given *Miranda* warnings (as set forth in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) before she spoke to the fire officials or the police detectives on various occasions. Her initial contact with Lt. Caldwell was on March 6, 1981.[6] Subsequently, she met with Lt. Cald-

6. Ms. Markman testified concerning her statements to Lt. Caldwell on March 6, 1981 as follows:

Q. When you were inside you responded freely to Lieutenant Caldwell's questions concerning the placement of certain items the night before; didn't you?
A. Yes, I did.
Q. In fact, you wanted to cooperate in finding out the cause of the fire, didn't you?
A. I certainly did.

.        .        .        .        .

Q. He told you he wanted to take a formal statement or a formal interview with you; is that correct?
A. He said, "I have to take a statement from you."
Q. You wanted to give it to him, didn't you, so that you could help determine and cooperate in finding out the cause of the fire, didn't you?

well on March 10, 1981 at the Snyder Avenue property. Detective McCabe of the Philadelphia Police Department was also working on the case because arson was suspected and he made an appointment with the appellee to come to the fire marshall's office which she did on March 17, 1981. Since Detective McCabe could not keep the appointment, Detectives Hogan and Fox, who were assigned to the fire marshall's arson strike force interviewed the appellee, and took a statement from her. The meeting lasted about two hours. At the conclusion of the meeting the appellee refused to take a lie detector test and she then was free to leave and did so.[7]

> A. That's correct.
>
> . . . . .
>
> Q. Indeed, wouldn't you describe your entire encounter with Lieutenant Caldwell on March 6th—up through and including until the time he left on March the 6th, wouldn't you describe your encounter with him as being friendly, congenial and courteous?
> A. Yes.
> Q. Before Lieutenant Caldwell left on March the 6th, you had given him two phone numbers where he could reach you, hadn't you?
> A. Yes, I did.

7. Appellee testified concerning the request for polygraph examination as follows:
> Q. In fact, after completing the interview they asked you if you would take a polygraph examination, didn't they?
> A. Yes, they did. And I asked them could I give them the reason why I was turning them down, and they said yes, I could.
> Q. I'm sorry. You asked them—
> A. I said, "I'm turning you down, and may I give you the reason why," and they said, "Yes, you may."
> Q. What was the reason?
> A. I said I had a burglary the year before. I had to go and take a polygraph test, which I passed, and it was not admissible in court. I said I'm not going to put myself through that again.
>
> . . . . .
>
> Q. So you had had previous encounters with police in criminal investigations, hadn't you?
> A. Criminal investigations?
> Q. Well, you testified you had been burglarized.
> A. I was burglarized. I didn't do any of the investigations. The police did.
> Q. You had had contact and encounters with police in connection with their conducting of criminal investigations?
> A. That's correct.

The court below concluded that from 12:30 p.m. on March 6, 1981 the appellee was in custody and entitled to *Miranda* warnings at that point. Since such warnings were not given the court below suppressed the appellee's statements given on March 6, and subsequent statements. On appeal, the Commonwealth contends that the appellee was not in custody when the statements were made and therefore *Miranda* warnings were not required. We agree with this contention. As stated by the United States Supreme Court in *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977):

In the present case, however, there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½ hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody "or otherwise deprived of his freedom of action in any significant way."

Such a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply

Q. You had been interviewed by police officers and police detectives before, hadn't you?
A. When the—yes, when we had the burglary.
Q. Had you ever been read what is called your Miranda warnings in the conduct or the course of that prior investigation?
A. No.

because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.

*See also Commonwealth v. McLaughlin,* 475 Pa. 97, 379 A.2d 1056 (1977) and Pennsylvania cases cited therein.[8]

In *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), a taxpayer was being investigated for federal income tax evasion. Two agents questioned him in a private home and *Miranda* warnings were not given. The United States Supreme Court held that notwithstanding that the defendant was the "focus" of a criminal investigation when he was questioned that *Miranda* warnings were not required as the defendant was not in custody, or otherwise deprived of his freedom in any significant way. As stated in *United States v. Caiello,* 420 F.2d 471, 473 (2d Cir.1969), and quoted in *Beckwith v. United States, supra:* "It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted,*

**8.** Appellee contends in the appellate brief that an individual must be given *Miranda* warnings if he is being questioned while in custody "or while the object of an investigation of which he is the focus." As noted in *Commonwealth v. McLaughlin, infra,* 475 Pa. at 101, 379 A.2d at 1057–1058 (1977):

In Pennsylvania "custodial interrogation" has been interpreted to mean either questioning ... 'while in custody *or while the object of an investigation of which he is the focus, ...' Commonwealth v. Feldman,* 432 Pa. 428, 432–33, 248 A.2d 1, 3 (1968)." *Commonwealth v. D'Nicuola,* 448 Pa. 54, 57, 292 A.2d 333, 335 (1972) (Emphasis added).[3] *Subsequent to these Pennsylvania cases, the United States Supreme Court in Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) explained that the Miranda Court "specifically defined 'focus,' [of an investigation] for its purposes, as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his action in any significant way.'* 384 U.S. at 444, 86 S.Ct. [1602] at 1612, 16 L.Ed.2d at 706 (emphasis supplied)." *Id.* at 347, 96 S.Ct. at 1616. *See also, Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). (Emphasis added).

*which led the court to impose Miranda requirements with regard to custodial questioning."* (Emphasis added).

In *Commonwealth v. Anderson,* 253 Pa.Super. 334, 385 A.2d 365 (1978) the coroner suspected a mother of causing her child's death by abuse. On two occasions the coroner asked the appellant to come to his office to discuss her child's death. At the second meeting she admitted striking the child with her fists. She was not given *Miranda* warnings nor any warnings prior to the statement that she made. This court held that *Miranda* warnings were not required as she was not in custody. The court stated at 253 Pa.Super. 341, 385 A.2d 368:

> For purposes of determining when the *Miranda* warnings must be given, *the relevant compulsion stems not from the suspect's perceived need to attend a police-suggested interview,* but from indicia of custody which lead a suspect to believe that the police will not release the interviewee until they have elicited a confession.[9] (Emphasis added).

In *Commonwealth v. Brodo,* 262 Pa.Super. 375, 396 A.2d 802 (1979) the police suspected the defendant of burglary and went to his home to question him about the burglary. While waiting for him to appear they noticed several items matching the description of items taken in the burglary. When the defendant came downstairs they asked him whether the items were his and where he obtained them. He then made a statement. Prior to questioning no warnings were given to him and this Court held that none were required. "[T]he mere fact that the police investigation has focused on a particular person will not require *Miranda* warnings before police interviews with that person." *Commonwealth v. Brodo, supra,* 262 Pa.Super. at 378, 396 A.2d

**9.** This court recently held in *Commonwealth v. Schoellhammer,* 308 Pa.Super. 360, 454 A.2d 576 (1982) that "the test for custodial interrogation is whether the suspect is physically deprived of his freedom of action in any significant way *or* is placed in a situation in which he reasonably believes that his freedom is restricted by the interrogation." (Emphasis in original). For a complete annotation of what constitutes "custodial interrogation" within the rule of *Miranda v. Arizona,* See 31 A.L.R.3rd 565 to 696.

at 804. In the instant case there is nothing to substantiate the conclusion of the lower court that the appellee was in custody at anytime on March 6, 1981, nor was she in custody at any subsequent time thereto prior to her arrest.[10] She was not deprived of freedom of action in any significant way nor was she placed in a situation where she could reasonably believe that her freedom was restricted. None of the interviews occurred in a police station, but rather took place in the burned premises, a nearby drug store, the appellee's own property on Broad Street or the fire administration building. She described the interview with Detectives Hogan and Fox as courteous and friendly. She was aware that she did not have to comply with the requests of the persons interviewing her. At the end of the interview with Detectives Fox and Hogan they requested that she take a polygraph examination and she refused because she had taken a polygraph examination in another matter and she did not want to go through it again. She also told the interviewers that she was in a hurry with the interview as her mother was in the hospital, and at the conclusion she left the fire administration building in her own car.

The record does not substantiate that appellee was suspected of committing arson before Lt. Caldwell and Lt. Baxter entered the burned premises on March 6, 1981. There could not even be a preliminary determination by the fire department that arson occurred until the department personnel examined the scene of the fire. After making a preliminary investigation on March 6, 1981, the appellee was suspected of being guilty of the crime of arson as she had been on the property shortly before the fire broke out and the landlord, Mr. Rothschild, told Lt. Caldwell in the telephone conversation on the morning of March 6th that someone told him that Ms. Markman threatened to leave the

10. Concerning custody the lower court considered the events of March 6, 1981 and stated in its opinion:

Under these circumstances we conclude that the defendant was in custody and entitled to Miranda warnings at that point. Having failed to give such warnings, the March 6, 1981 statement must be suppressed, together with all fruits derived therefrom, including the statement of March 17, 1981.

place in a shambles.[11]  Notwithstanding that the fire and police departments may have been suspicious of Ms. Markman in connection with possible arson after the preliminary investigation of March 6, 1981, this did not require that *Miranda* warnings be given to her prior to the interviews, in the absence of the compulsive aspect of custodial interrogation.  The record does not support the conclusion that Ms. Markman made any statements as the result of compulsion or intimidation or that they were not of her own free will, and the court below erred in suppressing the statements.

Order reversed and case remanded for proceedings consistent with this opinion.

This court does not retain jurisdiction in this matter.

**11.**  At the suppression hearing Ms. Markman testified that when she and Lt. Caldwell entered the premises in the early afternoon of March 6, 1981, that "it was dark, and it was all soaking wet. *Everything was in shambles."*  (Emphasis added).