## Commonwealth v. Weaver

508

C.P. of Carbon County, no. 005 CR 94.

*David W. Addy, assistant districk attorney,* for the Commonwealth.
*Stephen Peter Vlossak Sr.,* for the defendant.

LAVELLE, *P.J.,* November 1, 1994—Defendant Tracy J. Weaver stands charged with three counts of driving under the influence[1] and several summary offenses. Before the court is her motion to suppress statements she made to police officers and the results of her blood alcohol test.

Counsel have stipulated that the preliminary hearing transcript of December 29, 1993 and the testimony of Officer Mark A. Conrad at the June 20, 1994 suppression motion hearing shall constitute the record for deciding the instant motion. (Motion to suppress hearing, 6/20/94, p. 3.) Based on this record we make the following

## FINDINGS OF FACT

On October 26, 1993 at approximately 10-10:30 p.m. Harold Latshaw was driving on State Route 209 near the Towamensing firehouse, in Towamensing Township,

---

1. 75 Pa.C.S. §3731(a)(1); (a)(4); and (a)(5)(i).

Carbon County when he was hit from the rear by an unknown vehicle. (N.T. 12/29/93, pp. 4-5.) Latshaw chased after this vehicle until the vehicle came to a stop at which time he approached the white four-by-four Jimmy Blazer, and identified the vehicle's operator as defendant, Tracy Weaver. (N.T. 12/29/93, pp. 5-7.)

When asked to produce her driver's license and insurance Weaver stated that she was going home and then left the scene. (N.T. 12/29/93, pp. 6-7, 12.) Latshaw wrote Weaver's license plate in the dirt on the side of the road and provided this information to Trooper Conrad and Trooper Haas when they arrived. (N.T. 12/29/93, pp. 12, 14.) Trooper Conrad radioed the license plate number into the police barracks for a computer license check which produced Weaver's name and address. (N.T. 12/29/93, pp. 15-16.)

Trooper Gill called Weaver's telephone number twice. On the second phone call, the person who answered the phone identified herself as Weaver and told the trooper that she had been in a car accident earlier that evening. Trooper Gill informed Weaver that troopers would be coming to her home to speak to her about the accident. (N.T. 12/29/93, pp. 24-25.) No *Miranda* warnings were given to Weaver during these phone calls. (N.T. 12/29/93, p. 26.)

When the two officers arrived at Weaver's home later that evening, they saw a vehicle matching Latshaw's description and noticed slight damage to the hood, grille and bumper areas. The troopers, dressed in uniform, asked Weaver if they could come into her house (N.T. 12/29/93, p. 16) and she permitted them to enter her kitchen. The troopers asked Weaver to produce her operator's license, registration and insurance information. They observed that Weaver had slurred speech with

a slight odor of alcohol on her breath, a staggering walk and was very uncooperative. (N.T. 12/29/93, pp. 16-17.) When asked by the troopers if she was in an accident, Weaver replied "I don't know, was I?" (N.T. 6/20/94, p. 6.) Trooper Conrad then asked whether she had anything to drink since the accident and Weaver stated "No." (N.T. 12/29/93, p. 19; N.T. 6/20/94, p. 6.) The troopers gave her a field sobriety test in her kitchen and she failed it. (N.T. 12/29/93, p. 17.) At this time, Trooper Conrad believed Weaver was under the influence of alcohol. (N.T. 12/29/93, pp. 17, 20.)

Trooper Conrad then asked Weaver to submit to a blood alcohol test, which she refused, stating that she was "not going anywhere except to bed." (N.T. 12/29/93, p. 17.) Trooper Conrad then informed Weaver that "she could either cooperate or she would forcibly be taken into custody to allow her the opportunity to give blood." (N.T. 12/29/93, p. 17.) When Weaver continued to refuse the blood alcohol test she was put in handcuffs and transported to Palmerton Hospital. (N.T. 12/29/93, p. 18.) While on the way to the hospital, there was a colloquy between the officers and Weaver relating to the Implied Consent Law. (N.T. 12/29/93, p. 21.) During this colloquy, Weaver stated "of course, I'm f - - - ing drunk. I drank eight beers and I only weigh a f - - - ing 110 pounds. What do you think. Of course, I'm f - - - ing drunk." (N.T. 12/29/93, p. 20.)

At Palmerton Hospital blood was drawn from Weaver at 12:10 a.m. on October 27, 1993. (N.T. 12/29/93, p. 18.) At 12:12 a.m. on October 27, 1993 the trooper read to her for the first time her *Miranda* rights. (N.T. 12/29/93, p. 21.) The Pennsylvania State Police Crime Lab at Wyoming subsequently chemically tested Weaver's

blood sample which indicated a blood alcohol content of .33 percent. (N.T. 12/29/93, pp. 18-19.)

## DISCUSSION

It is hornbook law that testimonial or communicative evidence that is the product of custodial interrogation must be preceded by *Miranda* warnings.[2] The pivotal issue here is when, if at all, was defendant in custodial interrogation during the police questioning. Our resolution of this issue is circumscribed by some well settled case law. *Commonwealth v. Anderson,* 253 Pa. Super. 334, 385 A.2d 365 (1978) sets forth the guidelines for determining whether an interrogation is custodial in nature:

"(1) The mere fact that a police investigation has focused on a particular person will not require *Miranda* warnings before the police interview with the person.

"(2) If the police in fact place a person in custody or restrict his/her freedom in any significant way prior to, or during the interview, the interrogators must advise the person of his/her *Miranda* rights.

"(3) A suspect may be in custody even if the police have not taken him/her to a police station or formally arrested him/her.

"(4) Custodial interrogation occurs when a suspect is placed in a situation in which he/she reasonably believes that his/her freedom of action of movement is restricted by such interrogation." *Commonwealth v. Anderson, supra,* at 345, 385 A.2d at 370-71.

It must be noted during any such determination that:

"(M)ere focus on a subject is not automatically dispositive of custodial status, but the fact that the subject

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602 (1966).

was the focus of an investigation is a relevant factor during consideration of the second and fourth theorems, namely: whether the freedom of the subject is restricted or the subject is in custody, ... and whether the subject could reasonably believe that his [/her] freedom of movement is restricted." *Commonwealth v. Schoellhammer,* 308 Pa. Super. 360, 366, 454 A.2d 576, 579 (1982). (citations omitted)

Additionally, police interrogations over the telephone are not "custodial" in nature and need not be proceeded by *Miranda* warnings. *Commonwealth v. Michael,* 288 Pa. Super. 151, 431 A.2d 333 (1981).

Viewed in the light of these legal principles, it is clear that Weaver's contention that the police officer's failure to mirandize her before questioning her on the telephone violated her Fifth Amendment rights is without merit. She was simply not in custody. It is also clear from the evidence that the initial police interrogation in the kitchen of her home did not require any *Miranda* warnings because there was no evidence that her freedom was restricted in any way. Further, *Miranda* warnings were not required before the police subjected Weaver to the field sobriety test. These tests are not within the purview of the Fifth Amendment since the evidence procured is of a physical nature rather than testimonial. *Commonwealth v. Benson,* 280 Pa. Super. 20, 421 A.2d 383 (1980). See also, 75 Pa.C.S. §1547(k) (sobriety tests permitted to determine if the arrest of individual is warranted).

When Trooper Conrad informed Weaver that she would be taken forcibly to take a blood test followed by her handcuffing, her legal status changed drastically. Her freedom of movement ended and she was in police custody. At this point, before any further police questioning, *Miranda* warnings should have been given to

her. Because they were not, any statements she made during her questioning by the police while in the police car must be suppressed.

We decide the admissibility of the blood test results on other grounds.

75 Pa.C.S. §1547(b)(1) provides as follows:

"If any person placed under arrest for a violation of section 3731 (relating to driving under influence of alcohol or controlled substance) is requested to submit to chemical testing and refuses to do so, *the testing shall not be conducted* but upon notice by the police officer, the department shall suspend the operating privilege of the person for a period of 12 months."

This statute makes it clear that the police cannot force a suspected drunk driver to take a chemical test. The record shows that when the police decided to have Weaver "forcibly" submit to a blood test they violated Weaver's rights under this law. First, they did not give her the option of taking or refusing the blood test as required by the above cited statute. Secondly, they did not stop the blood testing process after Weaver indicated that she did not want to take the test. The blood test was therefore illegal. The results of the test, *i.e.* the blood alcohol content of Weaver's blood, were fatally flawed and are suppressible as the fruits of the poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Commonwealth v. Mackie,* 456 Pa. 372, 320 A.2d 842 (1974).

## CONCLUSIONS OF LAW

Weaver's inculpatory statements made in the police car on the way to the hospital and the results of the blood alcohol test were illegally obtained and therefore must be suppressed.

514

Accordingly, we enter the following:

ORDER

And now, November 1, 1994, it is hereby ordered and decreed as follows

(1) Defendant's motion to suppress defendant's inculpatory statements made in the police car while being transported to the hospital is hereby granted.

(2) Defendant's motion to suppress the blood alcohol test results, which were acquired contrary to 75 Pa.C.S. §1547(b), is hereby granted.