## Commonwealth *v.* Romberger, Appellant.

Argued May 23, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused December 21, 1973.*

*Carl B. Stoner, Jr.,* with him *Prowell, Stoner & Kusic,* for appellant.

*Marion E. MacIntyre,* Deputy District Attorney, with him *LeRoy S. Zimmerman,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE NIX, September 19, 1973:

This is a direct appeal from a conviction for first degree murder and a sentence of death imposed in accordance with the verdict of the jury. Appellant challenges the admissibility of statements made by him to investigating officers, allegedly taken without a previous warning of his right if indigent to the presence of counsel free of charge during the interrogation, as required by *Miranda v. Arizona,* 384 U.S. 436 (1966). We agree and reverse the conviction.[1]

The record shows that on November 4, 1965, the Harrisburg City Police received a missing person report concerning Joy Blanche Keifer, a resident of that city. The appellant had been on a date with Miss Keifer the previous evening and was the last person known to have seen her. On November 5, a Detective Barbush of the city police interviewed the appellant at the school which

---

[1] We need not reach the numerous other errors assigned by appellant in view of our resolution of this issue.

* Reporter's Note: On June 17, 1974, the Supreme Court of the United States granted a petition for a writ of certiorari. The Supreme Court of the United States vacated the judgment of the Supreme Court of Pennsylvania and remanded the cause to that Court for further consideration in light of *Michigan v. Tucker,* 417 U.S. 433 (1974).

employed his mother and appellant maintained that he had left Miss Keifer in front of her apartment early on the morning of November 4. He expressed a desire to aid the investigation to discover her whereabouts.

The next morning, November 6, the body of Joy Keifer was discovered in Wildwood Lake, near Harrisburg. At about 12:30 p.m. that afternoon, Detective Barbush, accompanied by two Pennsylvania State Troopers, went to appellant's residence. They advised him that he had a right to obtain counsel and to have counsel present and that he did not have to make any statements, as such statements could later be used against him. They requested appellant to follow them to City Hall in his car, and appellant did so, accompanied by one of the State Troopers. They arrived at City Hall about 1:10 p.m. and, after brief interviews at which appellant was again given the warnings noted above, it was determined that he should take a polygraph test. At 2:35 p.m., the appellant accompanied by two city detectives and two State Troopers, went to the State Police office in Harrisburg so that a State Police polygraph expert, Lieutenant Murray, could administer that test.

Appellant was interviewed by Lieutenant Murray until 5:30 p.m. During that time, the Lieutenant explained the operation of the polygraph and told the appellant that he should get his facts straight before answering the questions because the machine would detect any falsehood. In response to these admonitions, appellant altered his story four times, each time admitting more and more of the facts leading up to the murder, yet never actually admitting to the commission of the homicide.

At 5:30 p.m., appellant ordered and was provided with sandwiches which he ate until about 6:00 p.m. The interview was resumed and appellant was given substantially the same warnings mentioned earlier. A polygraph test was administered, and subsequently appel-

lant agreed to show investigating officers the scene of the death. At this time, appellant steadfastly maintained that: He had driven to the lake with the deceased and an argument had developed; the deceased had left the car, and appellant, being unable to find her, had driven back to Harrisburg. Subsequently, he became concerned and returned to the lake where he had discovered her body.

After showing the officers the scene of the crime, appellant was brought back to state police headquarters and charged with murder. He was arraigned and fully warned of his rights including the right to free counsel if indigent. Subsequently, he agreed to give first an oral and then a signed written statement admitting to the homicide.

At trial, Lieutenant Murray testified as to the various contradictory versions of the incident given by appellant during the interview. The signed confession was also introduced into evidence.

It is uncontested that, prior to the arraignment, appellant was never warned of his right to *free* counsel, if indigent. Appellant therefore argues that he did not knowingly and intelligently waive his right to have counsel present during the interrogation. We must agree.

At the outset, it should be noted that the trial of this crime (beginning January 9, 1967) followed the ruling of the United States Supreme Court in *Miranda v. Arizona,* 384 U.S. 436 (1966) (decided June 13, 1966). The *Miranda* safeguards are therefore applicable to this case even though the interrogation itself (November 6-7, 1965) pre-dated that ruling. *Johnson v. New Jersey,* 384 U.S. 719 (1966); *Commonwealth v. Yount,* 435 Pa. 276, 256 A. 2d 464 (1969); *Commonwealth v. Sites,* 427 Pa. 486, 235 A. 2d 387 (1967).

*Miranda* clearly holds that, before an accused is subjected to custodial interrogation: "In order fully to apprise a person interrogated of the extent of his rights

under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him." 384 U.S. at 473.

The Commonwealth maintains that this warning was unnecessary because the defendant was not in custody within the meaning of *Miranda* at least until the visit to the lake shortly before the arraignment.

We held in *Commonwealth v. Marabel*, 445 Pa. 435, 441, 283 A. 2d 285 (1971) that: " '[C]ustody occurs if a suspect is led to believe, as a reasonable person, that he is being deprived or restricted of his freedom of action or movement under pressures of official authority. . . . [T]he custody requirement of Miranda does not depend on the subjective intent of the law enforcement officer-interrogator, but upon whether the suspect is physically deprived of his freedom of action in any significant way or is *placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. . .' ".* After four hours of interrogation at the police station, appellant could not reasonably have believed that his freedom remained unfettered. Under the circumstances of this case we must conclude that a reasonable man in appellant's situation would have clearly perceived the restraint upon his freedom. It is equally as clear that at this point in time the police investigation had focused upon appellant. See, *Commonwealth v. D'Nicuola*, 448 Pa. 54, 292 A. 2d 333 (1972). Cf., *Mathis v. United States*, 391 U. S. 1 (1968); *Commonwealth v. Simala*, 434 Pa. 219, 252 A. 2d 575 (1969). It was known that he was having an affair with Miss Keifer, and that he feared that she was pregnant. Moreover, on a previous occasion appellant had stabbed his wife in a fit of rage. These facts, taken together with the fact that appellant was the last person known to have seen the victim alive supplied more than sufficient reason to cause the police to focus their attention upon the appellant.

The Commonwealth argues, alternatively, that the totality of the circumstances surrounding the interrogation indicates that the omitted warning was unnecessary. As this Court stated in *Commonwealth v. Yount,* 435 Pa. 276, 280, 256 A. 2d 469 (1969), cert. denied, 397 U.S. 925: "While a warning that the indigent may have counsel appointed need not be given to the person who is known to have an attorney or is known to have ample funds to secure one, *the expedient of giving a warning is too simple and the rights involved too important to engage in ex post facto inquiries into financial ability when there is any doubt at all on that score.* 384 U.S. at 473, n. 43, 86 S. Ct. at 1627, n. 43. We recently held in Commonwealth v. Dixon and Kontos, supra, that this loophole is a narrow one which can be utilized only in the clearest of cases. 432 Pa. at 426-27, 248 A. 2d at 233." (Emphasis in text) See also, *Commonwealth v. Sites,* supra. This case does not fall within that "narrow loophole". The appellant at the time of the interrogation was twenty years old and was unemployed. He had previously held sporadic employment as a gas station attendant. It is true that appellant's parents had provided legal services when he faced other criminal charges, however, absent an affirmative indication that appellant was confident of such resources at the time of this interrogation, we cannot say with any degree of certainty that the fourth warning was unnecessary.

Finally, the Commonwealth argues that appellant waived his right to receive the fourth warning. The Commonwealth has referred to several statements made by the appellant during the time of the interrogation to support their argument of waiver.[2] The decisive is-

---

[2] Appellant was alleged to have stated that he had been a "trusty" in prison and was well acquainted with obtaining legal services; at another point it is testified that he stated "what's all this about a lawyer—if I need a lawyer I will get my own".

sue in this area is not a question of a waiver of the warnings but whether or not the prisoner possessed sufficient knowledge which would enable him to voluntarily and intelligently waive his rights to counsel and his rights against self-incrimination. Thus *Miranda* announced a prophylactic rule to assure the quantum of knowledge necessary before a valid waiver can take place. Where the *Miranda* warnings are admittedly inadequate a waiver is necessarily ineffective unless the record is eminently clear that the information was known to the prisoner from some other source. No concept of a waiver of warnings can supply the deficiency, nor are we willing to accept braggadocio as a substitute for an actual finding of an awareness of the elements necessary to make a legally effective waiver.

The judgment of sentence is reversed and a new trial awarded.