369 A.2d 1156
COMMONWEALTH of Pennsylvania,
Appellee,

v.

Reginald McFADDEN, Appellant.

Supreme Court of Pennsylvania.
Submitted Jan. 12, 1976.
Decided Jan. 28, 1977.
Rehearing Denied March 15, 1977.

Nino V. Tinari, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Gold-blatt, Asst. Dist. Atty., Chief, Appeals Div., Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

The appellant, Reginald McFadden, was convicted by a jury of murder of the first degree, burglary, aggravated robbery, larceny and conspiracy.[1]  A sentence of life imprisonment was imposed on the murder conviction and concurrent prison sentences were imposed on the burglary, robbery, larceny and conspiracy convictions.  This one appeal followed.

The trial evidence established that McFadden, along with three other young males, entered the Philadelphia residence of sixty-year-old Sonia Rosenbaum, for the

1.  This was McFadden's second trial and conviction on the same charges.  Subsequent to the first convictions, the trial court awarded a new trial ruling that the evidentiary use of a written confession given by McFadden to the police was reversible error in that its use was proscribed by Pennsylvania Rule of Criminal Procedure 118 (now 130).  The Commonwealth did not appeal from this ruling.

purposes of theft. Mrs. Rosenbaum was forced to disclose the whereabouts of valuables in the house and was then bound and gagged. She suffocated and died as a result of the gag placed in her mouth.

During the second trial, evidence of oral incriminating admissions made by McFadden to the police was introduced into the record over objection. The sole question posed by this appeal is whether or not this evidence was properly admitted against the accused. The pertinent facts, as disclosed by the record, are these.

The burglary and other crimes here involved occurred on the night of December 7, 1969. Subsequently, McFadden's accomplices were taken into custody and implicated him. About 4:30 a. m. on December 11, the police went to the McFadden residence to take him into custody and to search the house.[2] When the officers knocked on the door, Mrs. McFadden, Reginald's mother, came to an upstairs bedroom window. The officers identified themselves and informed her of the purpose of their visit. Mrs. McFadden responded that she would come down to open the door but that Reginald was not at home since he was incarcerated in New York on a stolen car charge. Mrs. McFadden then went to the bedroom where Reginald slept, informed him that the officers were there to arrest him and advised him to flee.[3] She then went downstairs and opened the door.

In the meantime, Reginald hid in a closet until after the officers looked into his room. Then he went out an upstairs window onto a porch roof. However, he was

2. The police were armed with a search warrant.

3. Reginald had, in fact, been arrested and incarcerated in New York on a stolen car charge. However, Mrs. McFadden had succeeded in securing bail for Reginald on this charge. Also approximately one week before the arrest instantly, Philadelphia juvenile court officers informed Mrs. McFadden that Reginald was wanted on a bench warrant in Philadelphia. It was the bench warrant, Mrs. McFadden testified, that she thought was the subject of the arrest on December 11, until she was informed otherwise.

apprehended when he leaped to the ground. The apprehending officer brought Reginald inside the house for identification. His mother identified him as her son, Reginald.

Once police determined who he was, they promptly placed him under arrest. They informed him, while his mother stood immediately alongside, that he was under arrest for the murder of Sonia Rosenbaum and proceeded to inform him, also with his mother present, of his constitutional rights, as mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He was then handcuffed to a chair and left with his mother in the living room for approximately ten minutes while the officers completed their search of the house.[4]

During the search of the house, the police officers found and confiscated a sum of money in excess of $600.[5] When Mrs. McFadden discovered that the money had been confiscated, she began to insist that the money be returned to her. After the search had been completed, Mrs. McFadden was informed that Reginald was to be taken to the Police Administration Building and Reginald was taken away. Several police officers remained at the home for a short time thereafter, and when they were leaving, they offered Mrs. McFadden, who was crying over the confiscation of her money, a ride to the Police Administration Building. She accepted and was taken directly to the Police Administration Building. When she arrived, she immediately set about the task of securing a property receipt for the $600. She completed

4. He and his mother were together in the living room but it is not clear from the record whether or not they were alone. There were police officers assigned to guard each exit and the record does not show whether they assumed their post inside or outside of the house.

5. Police claimed to have found the cash on Reginald's person after he was found attempting to escape. Mrs. McFadden claimed the money was taken from her purse. In either event, the search warrant authorized, *inter alia*, a search for a large sum of money believed to have been taken from the Rosenbaum residence.

this task at approximately 7:45 a. m., and then requested to use the bathroom and to use the phone to call a lawyer to assist her in securing the return of her money and to assist her son.[6] The police complied with both requests, but she was unable to get in touch with her attorney.[7] Upon completion of her second call to her lawyer at 8:45 a. m., she requested to see her son but that request was refused for the present; she was told she would have to wait. She waited for approximately three hours without seeing her son and then left to confer with her attorney.

McFadden arrived at the Police Administration Building at approximately 5:20 a. m. He was placed in an interview room immediately. He was again informed that he was arrested for the murder of Sonia Rosenbaum and was again read his constitutional rights. He indicated that he understood his rights and had no reason not to talk to the police officers. He was questioned for approximately thirty minutes during which time he maintained that he was in no way connected to the Rosenbaum crimes. However, during this interview, two Gang Control Officers entered the room and informed McFadden that his accomplices had confessed and implicated him. Within the next fifteen minutes, McFadden made oral admissions, introduced at the second trial and complained of in this appeal, which admitted complicity in the burglary and gagging but which conflicted in some details with the statements of his accomplices. At 6:15 a. m., the first interview was completed; however, police

6. Mrs. McFadden testified that she could not phone earlier because, when Reginald was first arrested, the police officers were using her phone to contact headquarters since, relying on her representations that Reginald was not home, several of the officers had been dispatched to another location and were then being recalled.

7. Mrs. McFadden was told, by an answering service to call again at 8:45. When she called again, her attorney said, "Those boys of yours are giving you a rough time, when you leave there, come down to see me." He did not, however, offer any assistance at that time.

continued to question McFadden until approximately midnight of December 11, 1969. He was arraigned at a time approximately twenty-two and one-half hours after his arrest, during which time a written statement, not relevant to the second trial, was taken.[8]

At the time of his arrest on December 11, 1969, McFadden was sixteen years and ten months old.

McFadden maintains evidence of his oral incriminating admissions should have been suppressed for two reasons. First, he argues the admissions were the product of an unnecessary delay between arrest and arraignment in violation of Pa.R.Crim.P. 130 (then Rule 118) and *Commonwealth v. Futch,* 447 Pa. 389, 290 A.2d 417 (1972) and related cases. Appellant's argument stresses that a delay of over twenty-two hours occurred between the time McFadden was arrested and the time he was arraigned. He does not, however, consider that the admissions complained of in this appeal and used in the second trial were made within one and one-half hours of his arrest and within forty-five minutes of his arrival at the Police Administration Building. That is a crucial oversight. This Court has repeatedly held that, in order to suppress evidence under Rule 130, that evidence must be a product of the unnecessary delay between arrest and arraignment; that is, there must be some nexus between the delay and the evidence. *Commonwealth v. Smith,* 463 Pa. 393, 344 A.2d 889 (1975); *Commonwealth v. Coley,* 466 Pa. 53, 351 A.2d 617 (1976); *Commonwealth v. Young,* 460 Pa. 598, 334 A.2d 252 (1975); *Commonwealth v. Rowe,* 459 Pa. 163, 327 A.2d 358 (1974). In fact, this case is substantially similar to *Commonwealth v. Davis,* 460 Pa. 644, 334 A.2d 275 (1975) where this Court said:

"On the record before us, we find no unnecessary delay in appellant's arraignment which contributed to his

8. It was the evidentiary use of this written statement at the first trial that influenced the trial court to order the second trial. This evidence was not introduced at the second trial.

confession. Appellant orally confessed . . . within one hour after his arrival at police headquarters and within thirty minutes after his actual questioning began. Since appellant's oral statement was the same as his written confession, any delay in arraignment after the oral confession would not be prejudicial to appellant, since he had already admitted his participation in the homicides."

334 A.2d at 276. Since McFadden's oral admissions were not the product of the delay and no prejudice accrued as a result of that delay, the trial court did not err in ruling use of this evidence was not proscribed by Rule 130.

■ Second, McFadden argues that, since he was a juvenile at the time of his arrest, his oral admissions should have been suppressed because he did not consult beforehand with an attorney, his mother or some other interested adult.[9] See *Commonwealth v. Chaney*, 465 Pa. 407, 350 A.2d 829 (1975); *Commonwealth v. Riggs*, 465 Pa. 208, 348 A.2d 429 (1975); *Commonwealth v. Webster*, 466 Pa. 314, 353 A.2d 372 (1975); *Commonwealth v. McCutchen*, 463 Pa. 90, 343 A.2d 669 (1975); *Commonwealth v. Starkes*, 461 Pa. 178, 335 A.2d 698 (1975); *Commonwealth v. Roane*, 459 Pa. 389, 329 A.2d 286 (1974); *Commonwealth v. Smith*, supra. We conclude these decisions do not control here.

■ Here, McFadden had an opportunity to consult with an interested and informed adult; that is, his moth-

9. The Commonwealth contends that this issue has been waived. However, the question was argued at the suppression hearing preceeding McFadden's first trial and was included, *inter alia*, in McFadden's post trial motions following the first trial. Defense counsel sought to raise the question again in a second suppression hearing when, prior to the second trial, he requested that a new suppression hearing be held to determine this and other issues. The request for a second suppression hearing was refused and counsel noted his objection. The question was included in the post trial motions following the second trial and made a part of the brief in the instant appeal. Accordingly, the issue has not been waived.

er. After McFadden was detained while attempting to flee his home, he was returned to the living room and identified by his mother. Immediately thereafter, while Mrs. McFadden stood alongside her son, the police informed him that he was under arrest for the murder of Sonia Rosenbaum, described the victim and gave the address of her residence, and, then with his mother still present, the police warned him of his constitutional rights. McFadden was then handcuffed to a chair and left in his mother's company in the living room while the police proceeded with their search. At this point, advice could pass freely from mother to son. Therefore, both McFadden and his mother were made aware of the charges against him and of his rights, and had the opportunity to consult before any questions were asked him.

Nor can either Reginald or Mrs. McFadden be called unsophisticated or lacking knowledge of the criminal justice system. Reginald's arrest record shows sixteen prior arrests and seven prior adjudications of delinquency. Mrs. McFadden's older sons, Gorden and Victor, were each arrested several times prior to this incident. The record reveals that each of these three sons was arrested at least once in the presence of Mrs. McFadden. Further, Mrs. McFadden had previously secured counsel and had participated in criminal proceedings involving her sons in two states.

It is also significant that after his departure from the family dwelling, neither McFadden nor his mother asked to see the other before the incriminating admissions complained of here were made. At one point, McFadden asked to see his brother Victor, who was seventeen years old at the time, and had been taken to the Police Administration Building along with his brother. The request was promptly granted. Mrs. McFadden did not ask to

see her son until 8:45 a. m., two and one quarter hours after the incriminating admissions were made.[10]

Therefore, the rulings in *Smith,* supra, and related cases are inapposite here. Instantly, a knowledgeable defendant and his knowledgeable mother were informed of the charges against him and his constitutional rights at the time of his arrest. Thereafter, they were left in each other's company for ten minutes. From that time until well after the incriminating admissions complained of here were made, neither made any request to see the other. Therefore, there has been sufficient showing that there was an opportunity for this defendant to consult with his mother before waiving his rights.

Since the per se suppression rule does not apply, we must consider the question of the voluntariness of this confession under the totality of the circumstances test applicable to voluntariness of confessions generally. Here, McFadden was warned twice of his constitutional rights and twice responded that he knew and understood those rights before expressing his willingness to talk to the police officers. His confession was prompted by the information that his accomplices had implicated him as well as themselves. See *Commonwealth v. Fogan,* 449 Pa. 552, 296 A.2d 755 (1972). Under the circumstances, there can be no doubt that this confession was not the product of illegal police conduct and was voluntary.[11]

Judgment of sentence affirmed.

10. It is noted that when Mrs. McFadden asked to see her son, the request was refused for the present. She waited for three hours before departing to consult with her lawyer at his office. However, it is also noted that from the time of her arrival at the PAB until 7:45 a.m., Mrs. McFadden's primary interest was securing a property receipt and no request, either to see her son or to call an attorney to assist him, was made until that time. When she secured the property receipt, she requested to use a phone to call an attorney, which request was granted at 7:45. At 8:45, she first asked to see her son.

11. In his brief, appellant contends that at the time of his arrest, he was under the influence of heroin. However, at the suppres-

NIX, J., did not participate in the consideration or decision of this case.

POMEROY, J., joins in this opinion and filed a concurring opinion.

MANDERINO, J., filed a dissenting opinion in which ROBERTS, J., joins.

POMEROY, Justice, concurring.

I join in the opinion of the Court. While I agree that the recently enunciated decisions of this Court pertaining to juvenile confessions [1] do not, on the facts surrounding the interrogation of Reginald McFadden, serve to invalidate his confession, it is my view that the *per se* exclusionary rule which has evolved in those cases should not be considered applicable to the case at bar in any event. The arrest here was in 1969, and the trial in 1970. The first of the cases requiring parental or adult guidance with respect to juvenile confessions was decided in 1975. *Commonwealth v. Starkes*, 461 Pa. 178, 335 A.2d 698

---

sion hearing, Dr. Shuman, who was summoned to examine Reginald McFadden when he complained of stomach cramps during the interview process, testified that although Reginald was suffering from heroin withdrawal symptoms after eighteen hours of police custody, the symptoms were so mild that it would indicate that McFadden's daily intake of the drug was quite low. From this, Dr. Shuman testified that even if McFadden ingested heroin before his arrest, it would have no effect on his ability to comprehend the situation and would certainly not impair his volition unless the police offered him heroin in return for his admissions. Since that was not the case here, the suppression court found that even if McFadden ingested heroin immediately prior to his arrest, it had no effect on the voluntariness of his waiver or of his admissions.

1. See *Commonwealth v. Stanton*, 466 Pa. 143, 351 A.2d 663 (1976); *Commonwealth v. Smith*, 465 Pa. 310, 350 A.2d 410 (1976); *Commonwealth v. Webster*, 466 Pa. 314, 329, 353 A.2d 372 (1975); *Commonwealth v. Chaney*, 465 Pa. 407, 350 A.2d 829 (1975); *Commonwealth v. Riggs*, 465 Pa. 208, 348 A.2d 429 (1975); *Commonwealth v. McCutchen*, 463 Pa. 90, 343 A.2d 669 (1975); *Commonwealth v. Starkes*, 461 Pa. 178, 335 A.2d 698 (1975); *Commonwealth v. Roane*, 459 Pa. 389, 329 A.2d 286 (1974).

(1975). I do not believe that the police should be faulted for failing to adhere to the requirement relative to juvenile suspects when that requirement did not become part of our case law until several years after the time the police here were acting. See *Commonwealth v. Lee*, 470 Pa. ——, 368 A.2d 690 [1977] (Pomeroy, J., dissenting, joined by Mr. Chief Justice Jones and Mr. Justice Eagen). See also *Commonwealth v. Starkes*, 461 Pa. 178, 190, 335 A.2d 698, 703 (1975) (Eagen, J., dissenting, joined by Mr. Chief Justice Jones and Mr. Justice Pomeroy).

MANDERINO, Justice, dissenting.

I dissent. Appellant argues that a juvenile, because of his youth and lack of experience, is incapable of understanding the constitutional rights afforded him by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and therefore, without the aid and advice of someone more sophisticated and knowledgeable, any waiver on a juvenile's part is a nullity. This argument follows the reasoning of a majority of this Court in recent rulings concerning confessions by juveniles. See *Commonwealth v. Chaney*, 465 Pa. 407, 350 A.2d 829 (1975); *Commonwealth v. Webster*, 466 Pa. 314, 353 A. 2d 372 (1976); *Commonwealth v. McCutchen*, 463 Pa. 90, 343 A.2d 669 (1975); *Commonwealth v. Starkes*, 461 Pa. 178, 335 A.2d 698 (1975); *Commonwealth v. Roane*, 459 Pa. 389, 329 A.2d 286 (1974).

Prior to *Commonwealth v. Roane, supra,* this Court consistently ruled that the validity of a waiver of constitutional rights, be it by a juvenile or adult, depended upon whether the waiver was knowing and intelligent, and this in turn was to be resolved after a consideration of all the attending circumstances. In *Roane, supra,* however, a majority of this Court ruled that if the parent of a juvenile who is faced with police questioning specifically refuses to consent to a waiver of *Miranda*

rights and to questioning of the juvenile, the prosecution has a heavy burden to establish that the juvenile's waiver was knowing and intelligent. In the *Roane* opinion, it was stated that an *important factor* in determining whether a waiver of *Miranda* rights by a juvenile was knowing and intelligent would be evidence that, before any waiver was made, the juvenile *had access* to the advice and counsel of a parent, lawyer, or other adult interested primarily in his welfare. Since *Roane, supra,* a majority of this Court has extended *Roane,* and ruled that a waiver of *Miranda* rights by a juvenile is *per se involuntary,* unless the juvenile is granted beforehand the *benefit of counsel or parental or informed interested adult guidance. Commonwealth v. Smith,* 465 Pa. 310, 350 A.2d 410 (1975) ; *Commonwealth v. Chaney, supra; Commonwealth v. Riggs, supra; Commonwealth v. Mc-Cutchen, supra.* In *Commonwealth v. Smith, supra,* this Court stated:

" ' . . . absent a showing that a juvenile had an opportunity to consult with an interested and informed parent, or adult or counsel *before he waived his Miranda rights,* his waiver will be ineffectual.' " [Emphasis in original.] [Quoting from *Commonwealth v. Chaney, supra.*] 465 Pa. at 312, 350 A.2d at 411.

Appellant McFadden was arrested at 4:30 a. m., at his home in his mother's presence. At the time he was informed of his *Miranda* rights. He was then handcuffed to a chair in the living room and left there, with his mother, while the police completed their search of the house. The search took only ten minutes. During the course of the search appellant's mother got into an argument with the police over the money that they discovered. Furthermore, it is not clear whether appellant and his mother were left alone in the living room or whether the police stayed in the room with them. The majority's *assumption* that advice could pass freely from mother to son is not warranted. The record, as pointed out by the majority in footnote 4, does not show whether or not po-

lice were in the living room with appellant and his mother during the ten minute duration of the search.

It is now axiomatic that the prosecution has the burden of proving that an alleged waiver of constitutional rights is knowing and intelligent. *Commonwealth v. Goodwin*, 460 Pa. 516, 333 A.2d 892 (1975); *Commonwealth v. Ewell*, 456 Pa. 589, 319 A.2d 153 (1974). In my opinion the prosecution did not show that the appellant was given the opportunity to *consult* with his mother at the time that he was arrested, as required by *Smith, supra*. After he was informed of his rights, he was in his mother's presence for only ten minutes and for at least part of that time his mother was embroiled in an argument with the police over ownership of the money. Moreover, the prosecution did not show that appellant and his mother were left alone during this ten minute period. Under these circumstances I cannot conclude that appellant had meaningfully consulted with his mother.

Additionally, police gave no indication to either appellant or his mother that they were going to question him at that time. It appears that their only interest was in-carcerating appellant and searching the house for evidence. When the police finally did decide to question appellant, his mother was not present with him, although she was present in the police administration building. As we stated in *Commonwealth v. Webster, supra,* 466 Pa. at 326, 353 A.2d at 378,

". . . police officials must make a reasonable effort to provide an opportunity for the youthful accused *to confer with and receive the benefit of counsel* or an interested and informed adult['s] guidance before permitting him to elect to waive these important constitutional rights."

Accordingly, I would reverse the judgment of sentence and remand for proceedings consistent with this opinion.

ROBERTS, J., joins in this dissenting opinion.