470 A.2d 487

**COMMONWEALTH of Pennsylvania**

**v.**

**David McGRATH, Appellant.**

Supreme Court of Pennsylvania.

Argued April 26, 1983.

Decided Dec. 30, 1983.

Reargument Granted March 6 & May 14, 1984.

Stanford Shmukler, Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Div., Maxine Stotland, Asst. Dist. Attys., Philadelphia, for appellee.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHER-TY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

LARSEN,* Justice.

David McGrath was found guilty of third degree murder, aggravated assault, criminal conspiracy and a weapons offense by a jury sitting in the Criminal Division of the Philadelphia Court of Common Pleas. Post trial motions were argued and denied and, on September 25, 1980, McGrath was sentenced. A hearing on a petition to vacate and/or reconsider sentence was held and the petition was denied. This direct appeal was filed on October 27, 1980. At issue is whether McGrath's confession, which was introduced as evidence against him at trial, is admissible under

* This case was reassigned to this author on September 14, 1983.

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

On July 6, 1979, McGrath and a companion were apprehended by police after an automobile chase through the streets of Philadelphia. They were suspects in two separate shootings which had occurred at 3:47 a.m. and 6:45 a.m. on that day. The shootings were apparently racially motivated incidents which involved the random selection and shooting of three black men who were on the street; one was killed and two were wounded by bullets fired from one or more large caliber handguns. McGrath and a companion were taken into police custody shortly after 7:00 a.m. on the morning of the shootings after having been chased, lost and re-chased by several police vehicles. Both men were released later the same day as there was insufficient evidence at that time to charge them with a crime.

Subsequently, McGrath enlisted in the United States Marine Corps and was stationed at Paris Island, South Carolina, where he underwent basic training. On September 5, 1979, the Philadelphia police informed the Marine Corps at Paris Island that McGrath was the subject of an arrest warrant for homicide and other charges. The Philadelphia police and the Marine Corps agreed that the warrant was to be transmitted to the Buford County Sheriff's Department which would arrest McGrath and hold him in the county jail until Philadelphia police arrived to assume custody.

Following the discussion between Marine Corps personnel and the Philadelphia police, McGrath was ordered to report to his Series Commander, Lieutenant Macintyre. (A "Series" consists of 254 to 296 recruits.) According to the testimony of McGrath, the drill instructor who gave him this order also told him that he was wanted in Philadelphia for a shooting and that he would have to go to jail. The testimony of Lieutenant Macintyre was introduced, by stipulation, as follows: in response to a request from the legal division on the base at Paris Island, he interviewed McGrath. During the interview, he informed McGrath that he had been advised of McGrath's possible fraudulent en-

listment, and that there was a warrant for McGrath's arrest in Philadelphia charging him with homicide and other charges. Lieutenant Macintyre took McGrath through a "rising chain of command", which culminated with Captain Walter Gaskin, the Commanding Officer of "F" Company. (A Marine Corps "Company" consists of five "Series"; thus Captain Gaskin commanded approximately 1300–1500 recruits.)

Captain Gaskin's testimony was that he interviewed McGrath in his office in response to receipt of a memo from the battalion legal division concerning McGrath's "possible fraudulent enlistment." The memo mentioned that McGrath might have a police record (which presumably was not disclosed on the enlistment papers), but did not mention an outstanding warrant. Accordingly, at the time Gaskin interviewed McGrath, he asserted he knew nothing of the warrant or the homicide charges against McGrath, even though Lieutenant Macintyre and other Marine Corps personnel did know of the warrant and the charges. The reason offered for this discrepancy was that Macintyre, being McGrath's immediate superior officer, was given more detailed information from the legal division.

At the interview with Captain Gaskin, which was described as a fairly routine fraudulent enlistment matter, the captain told McGrath that he was being interviewed because of "something" having to do with his past record. He also said that he would have to make a recommendation to the colonel as to whether McGrath should be retained in the marines or discharged, and that if McGrath wanted to explain in order for the captain to have "a clear picture," he could do so. The captain testified as follows concerning what he said to McGrath:

> Private McGrath, you're in here because it's been indicated via the Battalion Legal Office that you're some type of fraudulent enlistment. It can be of any variety of reasons. Could have past police record or it could be of child support or any number of matters or reasons why there is a fraudulent enlistment. I am here to help you

out and of course refer my recommendation to the Battalion Commander or retention.

At this time I said you can tell me what it is about that you know of and maybe something you failed to tell the recruiter at the time of enlistment and if you want to, then I can help you based on the information you give me—some advice and what I will tell the Battalion Commander concerning retention.

Notes of Testimony of Suppression Hearing (N.T.S.H.) 533. The captain did not give McGrath *Miranda* warnings [1] or the warnings mandated by Article 31(b) of the Uniform Code of Military Justice, 10 U.S.C. § 831.[2] In response to the captain's questions, McGrath implicated himself in the Philadelphia shootings. The captain and others present at the interview testified at McGrath's criminal trial concerning his inculpatory statements.

Captain Gaskin further testified that when McGrath first made his inculpatory statement, a Lieutenant Dykhuizen was present, as was Lieutenant Macintyre. After McGrath told his story, the essence of which was that he was present at the shootings but had not pulled the trigger, the captain

1. The *Miranda* requirements, *none* of which were met in the instant case, are:
   "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning."
   384 U.S. 444–45, 86 S.Ct. at 1612.

2. Article 31(b) of the Uniform Code of Military Justice, 10 U.S.C. § 831, provides:
   Art. 31. Compulsory self-incrimination prohibited
   (b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

called in the Chief Drill Instructor, Master Sergeant Jones, and McGrath then repeated his story three or four times. The captain, who found the story "phenomenal", stated: "I was concerned about what he had said and I asked him to say it again and then I would ask him specific parts about it. [He repeated] the actual whole story maybe twice but different parts of it three or four times." N.T.S.H. 543.

The captain also testified that when McGrath entered his office pursuant to his order, McGrath stood at attention and could not speak unless spoken to. Other testimony indicated that at a later stage of the interview, McGrath stood "at ease" while repeating his statement. Although the captain testified that when he gives an order, he expects to be obeyed, he also testified that McGrath should have known that he did not have to answer the captain's questions under the Uniform Code of Military Justice: "He can refuse. As a matter of fact, in this time I had no reason to offer him rights but I asked him if he wanted me to help him. He could have voluntarily explained to me what had occurred. If he'd have said he didn't, I'd have said very well." N.T.S.H. 547.

Captain Gaskin indicated that when McGrath left his office, he was taken to a holding center, under supervision by drill instructors, to await transfer to the custody of civilian authorities (the Buford County Sheriff's Department). There were no specific orders given to McGrath at that time restricting his freedom of movement, but none were necessary because "from the time a recruit arrives until the time he leaves Paris Island he's under constant supervision. So there was someone with him at all times anyway". N.T.S.H. 557. The captain also testified that he learned of the Philadelphia arrest warrants only after completing the interview with McGrath and that the memo concerning "possible fraudulent enlistment" had, in fact, been a "mistake". That is, the captain later became aware that McGrath's matter was "not a fraudulent enlistment case at all but a warrant". N.T.S.H. 563.

.

McGrath's testimony was consistent with that of the Marine Corps witnesses. McGrath testified that after his initial encounter with the first drill instructor at which he was told that he was going to jail in Philadelphia because of a shooting, he was interviewed by Lieutenant Macintyre and two or three other drill instructors, including Master Sergeant Jones. One of the drill instructors read the charges to him and the lieutenant questioned him about the charges. He was then taken to pack all of his belongings and was told that he was being taken to Philadelphia. Within two hours of being interviewed by the lieutenant, after he had packed his belongings, he was interviewed by Captain Gaskin. With respect to this interview, McGrath was asked at the suppression hearing, "Were you aware that you had the alternative of not to explain these things to him?" McGrath answered: "No I didn't. I didn't understand it, you know, I had a right to say no to an officer". N.T.S.H. 575. McGrath also testified he believed that if he did not tell the captain about the shooting incident he would go to jail for not obeying an order. When it was pointed out that Captain Gaskin's words were not an order, McGrath replied:

Well, as a Private, anything officer says to you, it's—I consider it—I considered an order at the time. I have no social life, you know, with the officers or anything. So, like, what they say to me is his word or is law to me on that island.

N.T.S.H. 580.

The issue thus presented is whether, under the circumstances surrounding McGrath's questioning, the admitted absence of *Miranda* warnings prior to his interview by his Commanding Officer precludes the admission, at the criminal proceeding in the Court of Common Pleas of Philadelphia County, of inculpatory statements elicited in that interview.[3] In matters concerning the Fifth Amendment privi-

3. We are not here concerned with the failure of Captain Gaskin or other Marine Corps personnel to give the warnings required by the Uniform Code of Military Justice, Article 31(b). *See* note 2, *supra.*

lege against self-incrimination, this Court is bound by the pronouncements of the Supreme Court of the United States. *Malloy v. Hogan,* 378 U.S. 1, 10–11, 84 S.Ct. 1489, 1494–1495, 12 L.Ed.2d 653 (1964). Applying those pronouncements and precedent of this Court and the federal courts, we conclude that the inculpatory statements were elicited in violation of *Miranda* and must, therefore, be suppressed.

The Commonwealth advances several arguments as to why *Miranda* is inapplicable and *Miranda* warnings therefore unnecessary in this case. First, the Commonwealth contends that "application of the [Fifth Amendment's] exclusionary rule to [McGrath's] statement serves no deterrent purpose", as the suppression of the statement in the state criminal proceeding would have no appreciable deterrent effect on the conduct of federal military personnel, relying on *United States v. Newell,* 578 F.2d 827 (9th Cir.1978) and *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Brief for appellee at 20–22. Whatever appeal this rationale may have in the context of the admissibility of evidence seized in violation of a person's Fourth Amendment rights, *see Commonwealth v. DeJohn,* 486 Pa. 32, 53–73, 403 A.2d 1283, 1293–1304 (1979) (Larsen, J., dissenting) and *Stone v. Powell, supra,* the rationale is not valid when considering the suppression of statements obtained in violation of the Fifth Amendment. The Fifth Amendment privilege contains a much more explicit rule of exclusion than the court-made exclusionary rule for evidence illegally obtained in violation of the Fourth Amendment. The privilege against self-incrimination contained in the Fifth Amendment is that "No person ... shall be compelled in any criminal case to be a witness against himself." This privilege has two facets: the government may not use compulsion to elicit self-incriminating. state-

Article 31(b) would be relevant, perhaps dispositive, if we were reviewing a military proceeding. Since the instant proceeding is a civilian, criminal prosecution by a state sovereign, however, it is only *Miranda,* and federal and state precedent applying *Miranda,* that governs the admissibility of McGrath's statements. *See United States v. Miller,* 261 F.Supp. 442 (D.Del.1966).

ments in the first instance, and the government may not *permit the use of* self-incriminating statements, elicited in violation of the Fifth Amendment, against the defendant in the criminal prosecution. *Murphy v. Waterfront Commission of New York,* 378 U.S. 52, 57 n. 6, 84 S.Ct. 1594, 1598 n. 6, 12 L.Ed.2d 678 (1964) (*see* cases cited therein). Accordingly, the Fifth Amendment privilege is fully applicable whether the self-incriminating testimony is elicited by the federal government and used against the defendant in a state criminal proceeding, or elicited by the state government and used against the defendant in a federal criminal prosecution. *Id.* at 53 n. 1, 84 S.Ct. at 1596 n. 1.

Thus, the Commonwealth's reliance upon *Stone v. Powell,* *supra* (admissibility in federal habeas corpus proceeding of evidence allegedly obtained by state law enforcement officials in violation of Fourth Amendment rights) *and United States v. Newell, supra* ("Newell concededly seeks application of the exclusionary rule to his statements not because they were taken in violation of his constitutional rights but because they were taken in violation of his rights under military law and regulations to the assistance of counsel in court-martial proceedings" 578 F.2d at 827) is unjustified. The United States Supreme Court adopted prophylactic measures in *Miranda* which mandate the exclusion of statements rendered in the absence of the requisite warnings, without regard for the possible deterrent effect on the law enforcement agency which has compelled the self-incriminating statements.

In a related argument, the Commonwealth argues that *Miranda* is inapplicable because McGrath's questioners were federal military personnel, not police or law enforcement officers conducting a criminal investigation. Brief for appellee at 23–26. Again, this contention misperceives the nature of the Fifth Amendment and the proscriptions laid down by *Miranda* which are binding on the states.

By its own terms, *Miranda* held:

the prosecution may not use statements, whether exculpatory or inculpatory, stemming from *custodial interroga-*

*tion* of the defendant unless it demonstrates the use of procedural safeguards [the *Miranda* warnings] effective to secure the privilege against self-incrimination. *By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.*

384 U.S. at 444, 86 S.Ct. at 1612 (emphasis added).

As Mr. Justice Nix explained in *Commonwealth v. Chacko,* 500 Pa. 571, 577, 459 A.2d 311, 314 (1983), in Pennsylvania, the "test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation," (citations omitted). An exceedingly narrow construction of the foregoing—that *Miranda* is applicable *only* when the custodial interrogation is initiated by law enforcement/police officials—*might* be plausible if one focused exclusively on the words "questioning initiated by law enforcement officers." However, such a myopic focus would ignore the purpose of *Miranda* and the fact that, as previously noted, the Fifth Amendment is violated both when the self-incriminating statements are elicited by the government in the first instance, and also when the prosecution introduces such statements at the criminal prosecution. *Murphy v. Waterfront Commission of New York, supra.* Moreover, the Commonwealth's position overlooks a vast body of case law wherein *Miranda* warnings were deemed necessary where "custodial interrogation" was initiated by government officials who were not law enforcement or police officials. *See, e.g., Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) (*Miranda* applicable where Internal Revenue Service agents questioned suspect during custodial interrogation); *United States v. DeLaCruz,* 420 F.2d 1093 (7th Cir.1970) (*Miranda* applicable where airport customs officer questioned suspect during custodial interro-

gation); *United States v. Planche,* 525 F.2d 899 (5th Cir. 1976) (*Miranda* applicable where liquor control agents questioned suspect during custodial interrogation); *Commonwealth v. Chacko,* 500 Pa. 571, 459 A.2d 311 (1983) (*Miranda* applicable where prison guard questioned prisoner/suspect during custodial interrogation); *Commonwealth v. Simala,* 434 Pa. 219, 252 A.2d 575 (1969) (*Miranda* applicable where city mayor questioned suspect during custodial interrogation); *Commonwealth v. Bordner,* 432 Pa. 405, 247 A.2d 612 (1968) (*Miranda* applicable where suspect's father questioned suspect, in presence and with the acquiesence of police officers, during custodial interrogation); *United States v. Miller,* 261 F.Supp. 442 (D.Del.1966) (*Miranda* applicable where military officers questioned suspect during custodial interrogation). *See generally* cases annotated at Annot., 31 A.L.R.3d 565, *What Constitutes "Custodial Interrogation" within Rule of Miranda v. Arizona Requiring that Suspect be Informed of His Federal Constitutional Rights Before Custodial Interrogation,* (hereinafter "Custodial Interrogation") *and* Annot., 46 L.Ed.2d 903, *The Progeny of Miranda v. Arizona in the Supreme Court.*

Obviously, in determining whether the defendant/suspect was subjected to "custodial interrogation", the status of the government officials will be a significant factor, but not in and of itself dispositive. *See e.g., Commonwealth v. Chacko, supra* at 500 Pa. 580 n. 3, 459 A.2d 315 n. 3; *see generally Custodial Interrogation, supra* at 575–78, § 2(b) and (c). As the federal district court stated in *United States v. Miller,* 261 F.Supp. 442, 446 (D.Del.1966):

The argument that the Fourth and Fifth Amendments have no application to the search of Miller's person and his interrogation where the criminal jurisdiction of the federal courts is being invoked against military personnel must be rejected. It represents an attempt to extend the sphere of military justice and seeks to make civilian authority the handmaiden of military justice. When a member of the Armed Forces stands accused before a

civilian tribunal, he is protected with his full constitutional armor. His posture is no different from that of any other defendant so far as the protection of the Constitution is concerned. His military status cannot shear him of his basic rights.

*See also, United States v. Shafer,* 384 F.Supp. 486 (N.D. Ohio 1974) (*Miranda* applied where national guardsmen were "requested" by their superiors to make statements regarding events at Kent State incident). The determination of whether statements were elicited at a custodial interrogation must be made in light of the totality of circumstances involved, *Commonwealth v. Bordner, supra* at 432 Pa. 414, 247 A.2d 612, and the status of the questioner is only one of the relevant circumstances. *Commonwealth v. Chacko, supra* at 500 Pa. 578–579, 459 A.2d 314–15; *Commonwealth v. Ziegler,* 503 Pa. 555, n. 1, 470 A.2d 56, n. 1 (1983) (concurring opinion of Larsen, J., joined by Hutchinson, J.)

In the instant proceeding, there can be no doubt that, if not actually "in custody", McGrath's inculpatory statements were rendered as a result of interrogation while he was *at least* deprived of his freedom of action in a significant way. "Clearly, 'custody' of military personnel does not require the same restraints as in civilian life; similarly, 'interrogation' takes on a far different meaning in a military environment, where any superior officer has the right to demand that his questions be answered." *United States v. Shafer, supra,* 384 F.Supp. at 489. "Custody" over military personnel occurs when there has been some assumption of control over their movements, and "interrogation" includes requests for statements made in the course of an official investigation, even if not purported to be an investigation of possible civilian crimes, by a person having authority over the defendant/suspect. *Id.* at 489–90. As the *Shafer* court stated, it "ignores the realities of [the military] situation to say that one ordered to appear for interrogation has not been significantly deprived of his freedom of action." *Id.* at

490 *quoting United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

Considering the totality of the circumstances and the realities of the military situation presented on the record, McGrath was in custody and/or significantly deprived of his freedom of action when he rendered the challenged statements to Captain Gaskin. From the time he was first ordered to report to Lieutenant Macintyre until his transfer to the custody of the Buford County Sheriff's Department, McGrath was under the constant supervision and control of Marine officers and non-commissioned officers, including the Commanding Officer of his Company, the Commanding Officer of his Series, and his Chief Drill Instructor. Then boot-camp-private McGrath was informed by Lieutenant Macintyre that a warrant for McGrath's arrest on charges of homicide had been lodged in Philadelphia, and he was then taken through the "rising chain of command" and ordered to Captain Gaskin's office for questioning. At least for part of that questioning, McGrath stood at attention before several of his superiors, could speak *only* when spoken to, was (as always) expected to obey his superiors, and was "asked" to repeat his story three or four times. Under these circumstances, this Court cannot seriously entertain the naive notion that McGrath was not in custody or significantly deprived of his freedom of action when "interviewed" by his superior officers. This becomes especially apparent when placed in the proper perspective—it is not the questioner's state of mind, but rather, the reasonable belief of the suspect that his freedom of action is curtailed, which controls the determination. *Commonwealth v. Meyer*, 488 Pa. 297, 306–07, 412 A.2d 517 (1980) (custodial interrogation existed where defendant/suspect reasonably believed his freedom of action was restricted in circumstances where state trooper told him to wait at the scene of a traffic accident, he was the only person who was not a law-enforcement officer at the scene, and he was closely observed by state troopers who directed him to produce his owner's card and driver's license); *Common-*

*wealth v. Chacko, supra* (custodial interrogation existed where defendant/suspect was a prisoner in correctional institution and was asked by prison staff member if he was "involved in the incident" for which he was subsequently tried).

The Commonwealth would have us believe that no "custodial interrogation" took place because Captain Gaskin was only concerned with McGrath's possible fraudulent enlistment, and so, McGrath was not the focus of a criminal investigation. Again, the Commonwealth exaggerates the importance of one factor—whether the defendant/suspect had become the focus of an investigation—which factor does play a *role* in the determination of whether the defendant/suspect was in custody or his freedom of action curtailed (or was reasonably believed to be curtailed) in any significant way. *See generally Custodial Interrogation supra* at §§ 2 and 6. However, this factor alone is not dispositive. *Commonwealth v. Meyer, supra; Commonwealth v. McLaughlin,* 475 Pa. 97, 379 A.2d 1056 (1977); *Commonwealth v. Chacko, supra.* The record before us unequivocally establishes that, not only did McGrath reasonably believe his freedom of action was restricted, but also that his freedom *actually was* restricted, regardless of whether Captain Gaskin believed the "interview" was not a criminal investigation.

Finally, the Commonwealth suggests that no "interrogation" took place because Captain Gaskin "had no reasonable basis to expect that his question to [McGrath] about his possible fraudulent enlistment[4] was reasonably likely to elicit an incriminating statement about shootings in Philadelphia which had occurred before he enlisted in the Marines." Brief for appellee at 29–30. The Commonwealth would have us believe that McGrath simply "volunteered" his inculpatory statements. Brief for appellee at 30, n. 26.

4. "[You] can tell me what it is about that you know of and maybe something you failed to tell the recruiter ... and if you want to, then I can help you based on information you give me ...." N.T.S.H. at 533.

Once again, this position is naive and "ignores the realities" of the military setting generally, as well as the circumstances surrounding this particular questioning. Moreover, the argument shifts the perspective of our inquiry from the reasonable belief of the defendant/suspect to the state of mind of the questioner, an approach that has been rejected by this Court and the United States Supreme Court. *Commonwealth v. Chacko, supra* at 500 Pa. 579, 459 A.2d 315. The latter Court stated, in *Rhode Island v. Innis*, 446 U.S. 291, 301–02, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980):

the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

The "reasonable belief" approach, "long reflected by our cases, ... seems most consistent with *Miranda* and ... avoids reliance on self-serving statements either by the police or by the suspect himself." *Commonwealth v. Meyer, supra* at 488 Pa. 306–07, 307 n. 11, 412 A.2d 517, 522

*quoting* Remark of Professor Kasimar at the First Annual Supreme Court Review and Constitutional Law Symposium, reprinted in the Supreme Court 1978–79 Ch. 12 p. 184 (1979). *See also Commonwealth v. Simala, supra* (questioning of suspect by city mayor who stated "you look kind of down in the dumps ... if you want to talk, talk" was "interrogation" for *Miranda* purposes, when viewed in light of totality of circumstances) *and Commonwealth v. Chacko, supra* (questioning of prisoner/suspect by guard who asked "are you involved in the incident that happened this morning?" was "interrogation" for *Miranda* purposes).

Thus viewed, the "request" by Captain Gaskin of McGrath, who was ordered to the Commanding Officer's office in the presence of other Marine superiors, was not free to leave or to speak unless spoken to, and who had been informed by other Marine officers that a warrant for his arrest on charges including homicide had been issued by Philadelphia police, was clearly an "interrogation" within the meaning of *Miranda* as the Commanding Officer's inquiry, in light of all of the other highly custodial circumstances, was clearly "likely to elicit an incriminating response." *Commonwealth v. Chacko, supra* at 500 Pa. 579, 459 A.2d 315.

From the foregoing, it is apparent that McGrath's inculpatory statements were elicited by government officials during a custodial interrogation which was not preceded by *Miranda* warnings.[5] Accordingly, the statements cannot be used against McGrath in a criminal prosecution, and the lower court erred in failing to suppress said statements.

Mr. Justice Nix, in his dissenting opinion today, fails to acknowledge Pennsylvania's well-established test to determine whether *Miranda* warnings are required, namely, whether the defendant was actually physically deprived of his freedom of action in any significant way or placed in a situation in which he reasonably believes that his freedom

---

5. It is not contended by the Commonwealth, nor would the record support such contention, that McGrath knowingly, voluntarily and intelligently waived his *Miranda* rights.

of action or movement is restricted by such interrogation. *Commonwealth v. Chacko, supra* (Majority opinion by Nix, J.). The reason for this dissent is apparently because of the heinous nature of the racially motivated criminal acts involved. Each and every member of this Court is equally appalled by the vile and wanton acts committed by appellant in this case. Nevertheless, our analysis of the necessity for the *Miranda* warnings mandated by the United States Supreme Court is not affected by the nature or severity of the crimes. In *Brewer v. Williams*, 430 U.S. 387, 406, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424 (1977), the United States Supreme Court stated:

> The crime of which Williams was convicted was senseless and brutal, calling for swift and energetic action by the police to apprehend the perpetrator and gather evidence with which he could be convicted. No mission of law enforcement officials is more important. Yet "[d]isinterested zeal for the public good does not assure either wisdom or right in the methods it pursues." *Haley v. Ohio*, 332 U.S. 596, 605, 92 L.Ed. 224, 68 S.Ct. 302 [306], 36 Ohio Ops 530 (Frankfurter, J., concurring in judgment). Although we do not lightly affirm the issuance of a writ of habeas corpus in this case, so clear a violation of the Sixth and Fourteenth Amendments as here occurred cannot be condoned. The pressures on state executive and judicial officers charged with the administration of the criminal law are great, especially when the crime is murder and the victim a small child. But *it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all.* (emphasis added).

For the foregoing reasons, the judgments of sentence are reversed and the case is remanded for a new trial.

ROBERTS, C.J., joins in this opinion.

FLAHERTY, J., filed a concurring opinion.

HUTCHINSON, J., filed a concurring opinion.

ZAPPALA, J., filed a concurring opinion.

NIX, J., filed a dissenting opinion joined by McDER-MOTT, J.

McDERMOTT, J., filed a dissenting opinion.

FLAHERTY, Justice, concurring.

I concur in the result reached by the Opinion Announcing the Judgment of the Court, but because I regard the military relationship between a subordinate and superior officer in the armed services to be *sui generis*, I would limit this case to its facts and not extend the *Miranda* doctrine to non-police related custodial interrogations.

HUTCHINSON, Justice, concurring.

I concur in the result. Article 31(b) of the Uniform Code of Military Justice, 10 U.S.C. § 831(b), precluded appellant's Commanding Officer from interrogating him or asking him for a statement without advising him *inter alia* of the nature of the accusation against him. The captain's failure to do so, albeit under mistake, would have precluded the use of his confession in a military court. *See* 10 U.S.C. § 831(d). *See also United States v. Tempia*, 16 U.S.C.M.A. 629, 376 M.R. 249 (1967) (the military equivalent of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 [1966]). At a minimum, Article 31(b) of the Uniform Code of Military Justice required the warnings provided in that section where, as here, a suspect's commanding officer requested a statement from him. McGrath's commanding officer failed to give the warnings required by the Code. As a matter of comity this Court should recognize the Uniform Code and the decisions of the military courts interpreting that Act of Congress governing military justice as persuasive authority with respect to the warnings required and the admissibility, in a civilian court, of evidence obtained by the military from its members. *See e.g. Parisi*

*v. Davidson,* 405 U.S. 34, 46, 92 S.Ct. 815, 822, 31 L.Ed.2d 17 (1972).[1]

I am not convinced that under the "totality of circumstances" appellant was in actual custody during his conversation with his commanding officer. *See* p. 497 (dissenting opinion by Mr. Justice Nix, in which Mr. Justice McDermott joins). Moreover, I am concerned that by focusing merely on the "custodial" aspect of the case rather than both "custodial" and "by law enforcement officers" the opinion announcing the Judgment of the Court opens the *Miranda* rule to applications which are unintended and unforeseeable. However, because the Code of Military Justice would require such warnings we need not stretch or strain the *Miranda* rule in order to find that warnings should have been given to the appellant prior to the eliciting of his confession.

Thus, I disagree with Mr. Justice Larsen that *Miranda* applies here as a matter of either Pennsylvania or United States constitutional law.

ZAPPALA, Justice, concurring.

While I agree that the *Miranda* rule is applicable in the instant case, I must express my concern regarding the implications inherent in an overly-broad interpretation to which a plurality of this Court reaches.

I am concerned that by focusing merely on the "custodial" aspect of the case rather than both "custodial" and "by law enforcement officers", we open the rule to applications never envisioned. I do not think that was the intent of *Miranda* nor should we make it so.

**1.** *But see United States v. Newell,* 578 F.2d 827 (9th Cir.1978). I am unpersuaded that the exclusionary rule has a deterrent effect on police misconduct sufficient to justify its application, even in the face of "good faith" by law enforcement officials. However, without further instruction from the United States Supreme Court, I am unable to accept the suggested alternate holding in *Newell* that exclusion by a non-military criminal court of evidence obtained by the military has no effect on the military's conduct in interrogating its personnel.

For this reason, we do not need to stretch nor strain the *Miranda* rule in order to find in the instant case that warnings should have been given to the appellant prior to the eliciting of his confession. It is not necessary, because Military Officers under the Uniform Code of Military Justice are the equivalent of law officers and as such will be required either under *Miranda* or the Military Code of Justice itself to warn the appellant of his rights.

NIX, Justice, dissenting.

Appellant was convicted of the unprovoked and random shooting of three strangers, two at one location and one at another, as they lawfully attended to their own business oblivious of appellant's presence. That wanton shooting spree resulted in the death of one of the victims. The only suggested explanation for appellant's actions was his irrational hatred for members of his victims' race. Nevertheless, the majority has determined that a new trial must be awarded because of what they determine to have been the improper admission into evidence of an inculpatory statement made by appellant to his company commander. The tenuousness of this decision is reflected by the majority's inability to agree upon a basis for a finding that the statement in question was inadmissible. In my opinion each of the proffered analyses is unimpressive. I, therefore, must dissent to the disturbance of a judgment of sentence which was unquestionably deserved.

As to the applicability of the principles of *Miranda* [1], it is clear that appellant was not in actual custody during the conversation with the commanding officer and it is a close case, at best, as to whether the circumstances established a constructive custody. *See, e.g., Commonwealth v. Chacko,* 500 Pa. 571, 459 A.2d 311 (1983); *Commonwealth v. Meyer,* 488 Pa. 297, 412 A.2d 517 (1980); *Commonwealth v. Brown,* 473 Pa. 562, 375 A.2d 1260 (1977); *Commonwealth v. Fisher,* 466 Pa. 216, 352 A.2d 26 (1976); *Commonwealth*

**1.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*v. O'Shea,* 456 Pa. 288, 318 A.2d 713, *cert. denied,* 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685 (1974); *Commonwealth v. Romberger,* 454 Pa. 279, 312 A.2d 353 (1973), *vacated,* 417 U.S. 964, 94 S.Ct. 3166, 41 L.Ed.2d 1136 (1974), *reinstated on remand,* 464 Pa. 488, 347 A.2d 460 (1975); *Commonwealth v. Marabel,* 445 Pa. 435, 283 A.2d 285 (1971).

Even conceding the custodial requirement of *Miranda,* the "interrogation" was not conducted by law enforcement authorities. Captain Gaskin, who questioned appellant, was neither a law enforcement official nor acting as an agent of such an official, nor was he a member of any investigatory team. His purpose in interviewing appellant was not to further a criminal investigation. To the contrary, the record discloses that Captain Gaskin had no knowledge that appellant was suspected of criminal conduct, and invited appellant to speak to determine whether he could remedy an apparent problem with appellant's enlistment. Thus the application of *Miranda* is clearly misplaced.[2]

Since *Miranda* is inapplicable, the traditional rules relating to an alleged coerced confession or admission should then have been applied in the analysis of the issues herein raised. The case law is legion which sets forth the test as being the "totality of the circumstances." *See, e.g., Commonwealth v. Sakal,* 494 Pa. 286, 431 A.2d 261 (1981); *Commonwealth v. Betrand,* 484 Pa. 511, 399 A.2d 682 (1979); *Commonwealth v. Kampo,* 480 Pa. 516, 391 A.2d 1005 (1978); *Commonwealth v. O'Bryant,* 479 Pa. 534, 388 A.2d 1059 (1978); *Commonwealth v. Motley,* 472 Pa. 421, 372 A.2d 764 (1977); *Commonwealth v. McFadden,* 470 Pa. 604, 369 A.2d 1156 (1977); *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Johnson,* 467 Pa. 146, 354 A.2d 886 (1976); *Commonwealth v. Jones,* 457 Pa. 423, 322 A.2d 119 (1974); *Commonwealth v. Daven-*

2. Equally inapplicable is the suggestion that the requirements of Article 31(b) of the Uniform Code of Military Justice, 10 U.S.C. § 831, may serve as a basis for the result reached by the majority. That provision applies only to proceedings conducted in the military courts, and has no bearing on the admissibility of an inculpatory statement offered as evidence in a state criminal trial.

*port,* 449 Pa. 263, 295 A.2d 596 (1972); *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968). Clearly that test, properly applied, does not warrant the result reached by the majority.[3]

McDERMOTT, J., joins in this dissenting opinion.

McDERMOTT, Justice, dissenting.

The gravaman of *Miranda,* its progeny, and the entire field of law dealing with the fifth and sixth amendments is that an accused must not be compelled to incriminate himself. I see nothing in this record which demonstrates that appellant was compelled to do anything. The conclusion of the plurality to the contrary shows a greater concern for the content of appellant's statement than for the circumstances in which it was made.

In addition, I believe that the facts of this case are analogous to those which existed in *Commonwealth v. Ziegler,* 503 Pa. 555, 470 A.2d 56 (1983); and I find nothing in this record which warrants the directly contradictory result which the plurality decision effects.

Therefore, I dissent.

---

**3.** There is no basis in the record for finding that his statement was the product of intimidation. Nor was there any basis for a reasonable belief that his freedom of action was restricted by the interrogation. To the contrary, it appears that the setting was supportive.